UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY and ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY,<br><br>                              Plaintiffs,<br><br>vs.<br><br>MEDICAL EVALUATIONS, P.C.; FLINT WELLNESS & DIAGNOSTIC CENTER, PLLC; REHABILITATION MEDICINE GROUP, P.C.; TETE ONIANGO, M.D., PLLC; SUNCARE REHAB, INC.; ANN ARBOR PHYSICAL THERAPY SERVICES, P.C.; PROGRESSIVE THERAPY & REHAB CENTER, INC.; SPECTRUM DEVELOPMENT CORPORATION d/b/a RESTORATIVE THERAPY SERVICES, INC.; NORTHWESTERN REHABILITATION SERVICES, LLC; NEW ERA PHYSICAL THERAPY, P.C.; JAMES E. BEALE, JR., M.D.; IRWIN M. LUTWIN, D.O.; SAUL I. WEINGARDEN, M.D.; TETE E. ONIANGO, M.D.; SUNDARAM S. PILLAI; TAHZIBUL H. RIZVI; JIMS T. VARGHESE; VINOD B. JOSHI; and MARK J. BRENNAN, M.D.,<br><br>                              Defendants. | Civil Action No. _____<br><br><br><br>**Demand for Jury Trial** |

## COMPLAINT

Plaintiffs Allstate Insurance Company and Allstate Property & Casualty Insurance Company (collectively, "Allstate" and/or "plaintiffs"), by their attorneys SMITH & BRINK, P.C., hereby allege as follows:

## I.  INTRODUCTION

1.      This is a case about physical therapy clinics, physical therapists, medical clinics, physicians, and the owners, agents, and representatives of the same, who worked in concert with

each other since 2010 to engage in a scheme to defraud Allstate by submitting, or causing to be submitted, false and fraudulent medical records, bills, and invoices (collectively, "false medical documentation") through the U.S. Mail seeking reimbursement under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, for treatment and services that were not actually provided, were medically unnecessary, and were not lawfully rendered.

2.      The defendants fraudulently submitted claims for No-Fault insurance benefits to Allstate related to treatment that was not actually provided,  unnecessary, and unlawful through the submission of hundreds of bills and related documentation from (a) medical facilities Medical Evaluations, P.C. ("Medical Evaluations"), Flint Wellness & Diagnostic Center, PLLC ("Flint Wellness"), Rehabilitation Medicine Group, P.C. ("Rehabilitation Medicine Group"), and Tete Oniango, M.D., PLLC (collectively, the "medical facility defendants"); (b) physical therapy clinics Suncare Rehab, Inc. ("Suncare"), Ann Arbor Physical Therapy Services, P.C. ("Ann Arbor"), Progressive Therapy & Rehab Center, Inc. ("Progressive"), Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc. ("Restorative"), Northwestern Rehabilitation Services, LLC ("Northwestern"), and New Era Physical Therapy, P.C. ("New Era") (collectively, the "PT clinic defendants"); (c) physicians and the owners of the medical facility defendants James E. Beale, Jr., M.D. ("Beale"), Irwin M. Lutwin, D.O. ("Lutwin"), Saul I. Weingarden, M.D. ("Weingarden"), and Tete E. Oniango, M.D. ("Oniango") (collectively, the "physician defendants"); (d) physical therapy practitioners and the owners of the PT clinic defendants Sundaram S. Pillai ("Pillai"), Tahzibul H. Rizvi ("Rizvi"), Jims T. Varghese ("Varghese"), and Vinod B. Joshi ("Joshi") (collectively, the "physical therapist defendants"); and (e) Mark J. Brennan, M.D. ("Brennan")

3.      The purpose of the fraudulent scheme perpetrated by the defendants was to generate claims to, and collect payment from, Allstate pursuant to Michigan's No-Fault Act for the purported treatment of patients who had been involved in motor vehicle accidents.

4.      To achieve their fraudulent objective, the defendants engaged in a scheme whereby they, including by and through their representatives and agents, solicited patients to treat at the medical facility defendants and PT clinic defendants.

5.      Once patients arrived at the medical facility defendants, Beale, Lutwin, Weingarden, and Oniango performed, if at all, a cursory examination and immediately referred patients for physical therapy, almost always to one of the PT clinic defendants.

6.      The physical therapy that was performed, if at all, was done pursuant to a predetermined protocol pursuant to which patients overwhelmingly received the same type of treatment.

7.      The physical therapy was not tailored to each individual patient and patient-specific progress goals were not defined and attained.

8.      Instead, the defendants' goal was to perform as much physical therapy as possible for as long as possible to take advantage of Michigan's unlimited No-Fault benefits.

9.      The PT clinic defendants and the physical therapist defendants relied on the medical facility defendants and the physician defendants to write prescriptions for physical therapy and to refer patients to the PT clinic defendants.

10.      The PT clinic defendants, in turn, referred their patients to the medical facility defendants and to the physician defendants for continuing medical evaluations.

11.      The medical facility defendants and the physician defendants routinely billed for these evaluations at excessive levels/amounts.

12.     Thus, there was an obvious financial incentive for the defendants to recommend that additional treatment and evaluation was necessary, as it allowed the cycle of inter-referral to continue among the medical facility/physician defendants and the PT clinic/physical therapist defendants.

13.     The physician defendants also referred patients for electrodiagnostic testing, usually electromyography (EMG), that was not indicated and was not properly performed, if performed at all.

14.     Brennan conducted many of the bogus EMGs at issue in this Complaint.

15.     In addition to soliciting patients, engaging in improper and self-motivated referrals, and providing unnecessary treatment, the defendants also frequently billed Allstate for services and treatment that were not actually rendered.

16.     Allstate's review of claims submitted to it by the medical facility defendants and the PT clinic defendants since 2010 revealed the redundancy of treatment rendered across multiple providers and across multiple patients, supporting that the defendants were not independent as they claimed and that they employed a predetermined protocol of treatment that was not tailored to the clinical needs of each patient.

17.     Allstate reasonably relied on the claims and medical documentation submitted to it by, or on behalf of, the defendants to its detriment.

18.     Indeed, since 2010, Allstate has paid in excess of $405,379 to the defendants.

19.     Each of the defendants named herein conspired with one another to accomplish and to further the objectives of their fraudulent scheme detailed herein.

20.     All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

21.     The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in the payment of No-Fault benefits from Allstate to, or on behalf of, the defendants.

22.     In each claim at issue in this Complaint for which Allstate is seeking damages, an Allstate automobile insurance contract issued in the State of Michigan was the platform upon which the defendants perpetrated their fraudulent scheme.

23.     By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.

24.     Allstate's claim for compensatory damages includes: (1) payments made by Allstate to the defendants in reliance upon the defendants' false representations that they were eligible to receive reimbursement under the Michigan No-Fault Act, (2) payments made by Allstate to the defendants in reliance upon the false medical documentation submitted or caused to be submitted by the defendants, (3) treble damages, (4) statutory interest, (5) costs, including but not limited to, the costs of claims handling and the cost of investigation to uncover the fraudulent scheme perpetrated by the defendants, and (6) attorney's fees.

25.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that the defendants have no right to recover any outstanding claims for No-Fault benefits whereas (1) the defendants fraudulently billed Allstate for medical services that were not actually provided; (2) the defendants fraudulently billed Allstate for medical services that were not reasonably necessary; (3) the defendants billed Allstate for treatment that was not lawfully rendered; (4) the defendants engaged in fraudulent billing practices; and (5) the defendants engaged in a pervasive pattern and

practice of submitting false medical documentation through the U.S. Mail demanding payment from Allstate.

## II.   THE PARTIES

### A.   PLAINTIFFS

26.   Allstate Insurance Company and Allstate Property & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois.

27.   Allstate Insurance Company and Allstate Property & Casualty Insurance Company have their principal places of business in Northbrook, Illinois.

28.   At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

### B.   DEFENDANTS

#### 1.   Medical Evaluations, P.C.

29.   Medical Evaluations, P.C. is a Michigan professional corporation located in Southfield, Michigan that was incorporated on or about February 11, 2009.

30.   Beale is the President and owner of Medical Evaluations.

31.   Beale, Lutwin, Oniango, and Brennan worked out of Medical Evaluations.

32.   Several of the patients at issue in this Complaint were treated at Medical Evaluations, including those patients listed in Exhibit 1.

#### 2.   Flint Wellness & Diagnostic Center, PLLC

33.   Flint Wellness & Diagnostic Center, PLLC is a Michigan professional limited liability company based in Flint, Michigan with an initial filing date on or about January 26, 2012.

34.   Lutwin is the President and owner of Flint Wellness.

35.     Several of the patients at issue in this Complaint were treated at Flint Wellness, including those patients listed in Exhibit 2.

### 3.     Rehabilitation Medicine Group, P.C.

36.     Rehabilitation Medicine Group, P.C. is a Michigan professional corporation based in Southfield, Michigan.

37.     Weingarden is the owner of Rehabilitation Medicine Group.

38.     Several of the patients at issue in this Complaint were treated at Rehabilitation Medicine Group, including those patients listed in Exhibit 3.

### 4.     Tete Oniango, M.D., PLLC

39.     Tete Oniango, M.D., PLLC is a Michigan professional limited liability company based in Rochester Hills, Michigan organized on or about July 21, 2009.

40.     Oniango is the owner of Tete Oniango, M.D., PLLC.

41.     Several of the patients at issue in this Complaint were treated at Tete Oniango, M.D., PLLC, including those patients listed in Exhibit 4.

### 5.     Suncare Rehab, Inc.

42.     Suncare Rehab, Inc. is a Michigan corporation located in Southfield, Michigan.

43.     Pillai is the owner of Suncare.

44.     Several of the patients at issue in this Complaint were treated at Suncare, including those patients listed in Exhibit 5.

### 6.     Ann Arbor Physical Therapy Services, P.C.

45.     Ann Arbor Physical Therapy Services, P.C. is a Michigan professional corporation.

46.     Upon information and belief, Rizvi is an owner of Ann Arbor.

47.     Rizvi is the President of Ann Arbor.

48.     Ann Arbor, Progressive, and Restorative all use the assumed name "Rehab Specialists Group, Inc.," which is associated with Rizvi.

49.     Several of the patients at issue in this Complaint were treated at Ann Arbor, including those patients listed in Exhibit 6.

### 7.     Progressive Therapy & Rehab Center, Inc.

50.     Progressive Therapy & Rehab Center, Inc. is a Michigan corporation.

51.     Upon information and belief, Rizvi is an owner of Progressive.

52.     Rizvi is the President of Progressive.

53.     Progressive, Ann Arbor, and Restorative all use the assumed name "Rehab Specialists Group, Inc.," which is associated with Rizvi.

54.     Several of the patients at issue in this Complaint were treated at Progressive, including those patients listed in Exhibit 7.

### 8.     Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc.

55.     Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc. is a Michigan corporation.

56.     Upon information and belief, Rizvi is an owner of Restorative.

57.     Rizvi is the President of Restorative.

58.     Restorative, Ann Arbor, and Progressive all use the assumed name "Rehab Specialists Group, Inc.," which is associated with Rizvi.

59.     Several of the patients at issue in this Complaint were treated at Restorative, including those patients listed in Exhibit 8.

### 9.    Northwestern Rehabilitation Services, LLC

60.    Northwestern Rehabilitation Services, LLC is a limited liability company organized under the laws of the State of Michigan.

61.    Varghese is the owner of Northwestern.

62.    Several of the patients at issue in this Complaint were treated at Northwestern, including those patients listed in Exhibit 9.

### 10.    New Era Physical Therapy, P.C.

63.    New Era Physical Therapy, P.C. is a Michigan professional corporation.

64.    Joshi is the owner of New Era.

65.    Several of the patients at issue in this Complaint were treated at New Era, including those patients listed in Exhibit 10.

### 11.    James E. Beale, Jr., M.D.

66.    James E. Beale, Jr., M.D. is a resident and citizen of the State of Michigan.

67.    Beale is a licensed physician in the State of Michigan.

68.    At all relevant times, Beale owned Medical Evaluations.

69.    In 2003, Beale was reprimanded by the Michigan Board of Medicine for actions constituting "negligence" and "incompetence."

70.    In 1988, Beale's license to practice medicine was suspended for pre-signing blank prescription forms which were used by a physician's assistant to prescribe controlled substances.

71.    Beale purportedly treated and evaluated several of the patients at issue in this Complaint.

### 12.    Irwin M. Lutwin, D.O.

72.    Irwin M. Lutwin, D.O. is a resident and citizen of the State of Michigan.

73.     Lutwin is a licensed osteopathic physician in the State of Michigan.

74.     At all relevant times, Lutwin owned Flint Wellness.

75.     In 2010, Lutwin was placed on probation by the Michigan Board of Medicine for actions constituting "negligence."

76.     Lutwin purportedly treated and evaluated several of the patients at issue in this Complaint.

### 13.     Saul I. Weingarden, M.D.

77.     Saul I. Weingarden, M.D. is a resident and citizen of the State of Michigan.

78.     Weingarden is a licensed physician in the State of Michigan.

79.     At all relevant times, Weingarden owned Rehabilitation Medicine Group.

80.     Weingarden purportedly treated and evaluated several of the patients at issue in this Complaint.

### 14.     Tete E. Oniango, M.D.

81.     Tete E. Oniango, M.D. is a resident and citizen of the State of Michigan.

82.     Oniango is a licensed physician in the State of Michigan.

83.     At all relevant times, Oniango owned Tete Oniango, M.D., PLLC.

84.     Oniango purportedly treated and evaluated several of the patients at issue in this Complaint.

### 15.     Sundaram S. Pillai

85.     Sundaram S. Pillai is a resident and citizen of the State of Michigan.

86.     Pillai is a licensed physical therapist in the State of Michigan.

87.     At all relevant times, Pillai owned Suncare.

### 16. Tahzibul H. Rizvi

88.    Tahzibul H. Rizvi is a resident and citizen of the State of Michigan.

89.    Rizvi is a licensed physical therapist in the State of Michigan.

90.    Upon information and belief, at all relevant times, Rizvi owned Ann Arbor, Progressive, and Restorative.

91.    At all relevant times, Rizvi served as the President of Ann Arbor, Progressive, and Restorative.

### 17. Jims T. Varghese

92.    Jims T. Varghese is a resident and citizen of the State of Michigan.

93.    Varghese is a licensed physical therapist in the State of Michigan.

94.    At all relevant times, Varghese owned Northwestern.

### 18. Vinod B. Joshi

95.    Vinod B. Joshi is a resident and citizen of the State of Michigan.

96.    Joshi is a licensed physical therapist in the State of Michigan.

97.    At all relevant times, Joshi owned New Era.

### 19. Mark J. Brennan, M.D.

98.    Mark J. Brennan, M.D. is a resident and citizen of the State of Michigan.

99.    Brennan is a licensed physician in the State of Michigan.

100.   Brennan purportedly treated several of the patients at issue in this Complaint, including several patients of Medical Evaluations and Flint Wellness.

## III.   JURISDICTION AND VENUE

101.   Jurisdiction over this action is conferred upon this court by 28 U.S.C. §§ 1331 and 1332.

102.   Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

103.   Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of wrongful acts known to Allstate and alleged herein with particularity were carried out within the Eastern District of Michigan.

## IV.   MICHIGAN'S NO-FAULT ACT

104.   Allstate underwrites automobile insurance in Michigan.

105.   Michigan's No-Fault Act provides for the payment of unlimited medical and rehabilitative benefits on a first-party payor basis for injured victims of motor vehicle accidents. Mich. Comp. Laws § 500.3107(1)(a).

106.   Personal protection insurance benefits are payable for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services, and accommodations for an injured person's care, recovery, or rehabilitation" arising out of a motor vehicle accident.  Mich. Comp. Laws § 500.3107(1)(a).

107.   "Under [the No-Fault] statutory scheme, an insurer is not liable for any medical expense to the extent it is not a reasonable charge for the particular product or service, or if the product or service itself is not reasonably necessary."  Nasser v. Auto Club Ins. Ass'n, 435 Mich. 33, 49 (1990).

108.   A claimant who seeks to hold an insurer liable for No-Fault benefits has the burden of proving that the service claimed is reasonably necessary and that the charge for the service is reasonable.  Id.

109.   Claims for personal injury benefits under the No-Fault Act are available only if the benefits are for "accidental bodily injury" and only if those injuries "arise[e] out of" or are

12

caused by "the ownership, operation, maintenance or use of a motor vehicle . . . ." Mich. Comp. Laws § 500.3105(1).

110. Subject to limited exceptions, an insurer must pay each claim for personal protection insurance benefits arising out of a motor vehicle accident within thirty (30) days after receiving "reasonable proof of the fact and of the amount of the loss sustained." Mich. Comp. Laws § 500.3142(2).

111. The Michigan No-Fault Act provides that "[a] physician, hospital, clinic or other person or institution" may only charge a "reasonable amount" for personal injury protection (PIP) benefits for treatment/services which have been "lawfully render[ed]" to an injured person who has sustained bodily injury in an automobile accident. Mich. Comp. Laws § 500.3157.

112. "If the treatment was not lawfully rendered, it is not a no-fault benefit and payment for it is not reimbursable." Cherry v. State Farm Mut. Auto. Ins. Co., 195 Mich. App. 316, 310 (1992).

113. The Michigan No-Fault Act provides that an insurer "may be allowed by a court an award of reasonable sum against a claimant as an attorney's fee for the insurer's attorney in defense against a claim that was in some respect fraudulent or so excessive as to have no reasonable foundation." Mich. Comp. Laws § 500.3148(2).

114. As alleged in this Complaint, the defendants violated Michigan's No-Fault Act by submitting, causing to be submitted, or knowing that bills would be submitted to Allstate seeking reimbursement for services and treatments that were not actually provided; were not reasonably necessary for the care, recovery, or rehabilitation of the defendants' patients; were not lawfully rendered; and were not properly billed.

## V.   SOLICITATION OF PATIENTS

### A.   MICHIGAN STATUTES PROHIBITING THE SOLICITATION OF LEGAL CLIENTS AND MEDICAL PATIENTS

115.    Michigan law prohibits the solicitation of persons "for the purpose of representing that person in making a claim for damages or prosecuting an action or causes of action arising out of a personal injury claim . . . or to employ counsel for the purpose of that solicitation . . . ." Mich. Comp. Laws § 750.410(1).

116.    It is also unlawful in Michigan for "[a]ny physician or surgeon engaged in the practice of medicine in this state" to "employ any solicitor, capper, or drummer for the purpose of procuring patients."  Mich. Comp. Laws § 750.429.

117.    One who knowingly and intentionally "[e]mploys, uses, or acts as a runner, capper, or steerer with the intent to falsely or fraudulently obtain benefits under  a contract of insurance or to falsely or fraudulently assert a claim against an insured or an insurer for providing services to the client, patient or customer" has committed a "fraudulent insurance act." Mich. Comp. Laws § 500.4503(h).

118.    As these above-cited statutes illustrate, Michigan law prohibits the solicitation of clients/patients by attorneys, physicians, and surgeons.

### B.   DEFENDANTS' PATIENT SOLICITATION

119.    Despite Michigan's prohibition on patient solicitation, the defendants actively employed a number of unlawful and improper methods to obtain patients.

120.    For example, agents of the defendants used police reports to identify persons involved in motor vehicle accidents.

121.    The defendants' agents called the accident victims and instructed them to seek treatment with the defendants.

122.    At times, the defendants' agents pretended to be representatives of Allstate who directed the accident victims to one or more of the defendant providers.

123.    Allstate does not make recommendations regarding which healthcare provider its insureds should see.

124.    The defendants also worked with certain local Michigan personal injury attorneys to obtain patients.

125.    The *quid pro quo* relationships between these attorneys and the defendants worked as follows: the attorneys agreed to refer their clients to the defendants and the defendants instructed their patients to sign up with the attorneys if they were not already represented by counsel.

126.    The relationship between the attorneys and the defendants ensured a consistent flow of clients/patients between them.

127.    The defendants also worked closely with several transportation companies to obtain patients.

128.    These patients did not request to be treated at the medical facility and PT clinic defendants, but were delivered to the defendants by the transportation companies nonetheless.

129.    After initial visits/treatment, the defendants also used the transportation companies to ensure the continued appearance of patients at their clinics, which allowed them to bill Allstate for additional services.

130.    Indeed, as demonstrated on the chart annexed hereto at Exhibit 11, the defendants ordered that more than half of the patients at issue in this Complaint required transportation services, despite the fact that almost every patient at issue herein was involved in a low-level motor vehicle accident and was fully ambulatory.

### 1.    Exemplar Claims

131.    Allstate insureds confirmed that they were solicited to treat with the defendants.

132.    The following patients/Allstate insureds exemplify the fact and extent of the defendants' solicitation efforts.

### a.    R.H. (Claim No. 0203296883)[1]

133.    Allstate insured R.H. received a call after her motor vehicle accident from a woman who had obtained the police report of the accident.

134.    The female caller confirmed that she obtained R.H.'s phone number by the police report.

135.    The female caller directed R.H. to see Lutwin to receive treatment.

136.    R.H. did in fact treat with Lutwin at Medical Evaluations.

137.    Lutwin also referred R.H. for physical therapy at Northwestern.

138.    Northwestern billed Allstate for the services purportedly provided to R.H., including submitting medical records and claims for payment to Allstate through the U.S. Mail.

139.    Allstate reasonably relied on these submissions in adjusting the claims.

### b.    C.T. (Claim No. 0273135715)

140.    Allstate insured C.T. received multiple phone calls after she filed a police report regarding her motor vehicle accident.

141.    One of the callers was a man named "Aaron" who stated to her that he worked for Allstate.

142.    "Aaron" referred C.T. to Northwestern.

143.    C.T. was also "examined" by Beale, which consisted solely of him asking her questions.

---

[1] To protect the privacy of its insureds, Allstate refers to them herein by initials and Allstate claim number.

144.    Despite not physically examining C.T., Beale nonetheless put her on disability restrictions.

145.    On the same date, Beale referred C.T. for physical therapy at Northwestern.

146.    "Aaron" continued to call C.T. to "check[] in" and to confirm that C.T. was continuing to seek treatment and how often.

147.    Allstate, including anyone by the name of "Aaron," does not make recommendations as to which healthcare provider its insureds should see.

148.    Northwestern billed Allstate relative to the services purportedly provided to C.T., including submitting medical records and claims for payment to Allstate through the U.S. Mail.

149.    Allstate reasonably relied on these submissions in adjusting the claims.

###   c.    M.M.A. (Claim No. 0204672422)

150.    Allstate insured M.M.A. was contacted by a Michigan personal injury attorney after her motor vehicle accident.

151.    The attorney sent a representative (and a Spanish interpreter) to M.M.A.'s home to complete paperwork.

152.    The attorney representative told M.M.A. that the attorney's office would set up transportation and treatment for her.

153.    The transportation company arrived at M.M.A.'s home and transported her to see Beale at Medical Evaluations.

154.    M.M.A. did not ask or request to be transported or treated at Medical Evaluations.

155.    Beale referred M.M.A. for physical therapy at Restorative.

156.    Medical Evaluations and Restorative billed Allstate for the services purportedly provided to M.M.A., including submitting medical records and claims for payment to Allstate through the U.S. Mail.

157.    Allstate reasonably relied on these submissions in adjusting the claims and tendering payment.

## VI.    FRAUDULENT BILLING FOR SERVICES NOT RENDERED

158.    The defendants frequently billed Allstate for services that were not actually provided.

159.    The medical facility defendants and the physician defendants (Beale, Lutwin, Weingarden, and Oniango) routinely billed Allstate for initial office visits and follow-up examinations.

160.    However, many of the initial office visits and follow-up examinations for which Allstate was billed never actually occurred.

161.    Furthermore, the PT clinic defendants and the physical therapist defendants routinely submitted claims to Allstate seeking reimbursement for physical therapy services that were not actually provided.

162.    The defendants' pervasive pattern of submitting demands for payment for services that were not provided is indicative of their goal to submit as many claims for payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

163.    All of the claims submitted by the defendants to Allstate through the U.S. Mail seeking reimbursement for treatment that never actually occurred are fraudulent.

164.    None of the fraudulent claims submitted by the defendants are compensable under the Michigan No-Fault Act.

A.    **EXEMPLAR CLAIMS**

165.    The following are representative examples of the defendants' extensive practice of fraudulently billing Allstate for services that were not actually provided.

1.    **M.M.A. (Claim No. 0204672422)**

166.    Patient M.M.A. purportedly received physical therapy at Restorative for approximately ten (10) months.

167.    Restorative billed Allstate for electrical stimulation purportedly provided to M.M.A. on 73 separate occasions.

168.    M.M.A. never received electrical stimulation during the months of physical therapy she received at Restorative.

169.    Restorative billed Allstate for ultrasound purportedly provided to M.M.A. on 62 separate occasions.

170.    M.M.A. never received ultrasound during the months of physical therapy she received at Restorative.

171.    Restorative billed Allstate for these two physical therapy modalities at least 135 times, though none were actually provided to M.M.A.

172.    Beale also billed Allstate several times for "evaluations" he purportedly did of M.M.A. at Medical Evaluations on the following dates of service: May 24, 2011; June 21, 2011; August 25, 2011; and November 10, 2011.

173.    For each of these dates of service, Beale billed Allstate for a level four (June 21, 2011; August 25, 2011; and November 10, 2011) or level five (May 24, 2011) office visit.

174.     According to the American Medical Association ("AMA"), which publishes the Current Procedural Terminology ("CPT") Codes, a level five initial patient office visit (CPT Code 99205, which Beale billed on May 24, 2011) requires that a "comprehensive" patient history be taken, a "comprehensive" examination be done, and that the physician employ medical decision-making of "high complexity."

175.     The AMA describes a level five initial patient office visit as follows: "Usually, the presenting problem(s) are of moderate to high severity.  Physicians typically spend 60 minutes face-to-face with the patient and/or family."

176.     The documentation submitted to Allstate does not evidence that Beale completed a comprehensive examination or patient history of M.M.A. or that M.M.A. presented with symptoms that required Beale to make decisions of high complexity.

177.     Moreover, M.M.A. testified that Beale spent twenty (20) minutes with her during the May 24, 2011 office visit, which is one-third of the time suggested by the AMA to bill using CPT Code 99205.

178.     The AMA states that a level four follow-up office visit (CPT Code 99214, which Beale billed on June 21, 2011; August 25, 2011; and November 10, 2011) requires that the physician conduct a "detailed" history and examination and that medical decision-making of "moderate complexity" be involved.

179.     The AMA describes a level four follow-up visit as follows: "Usually, the presenting problem(s) are of moderate to high severity.  Physicians typically spend 25 minutes face-to-face with the patient and/or family."

180.    M.M.A. never spent more than five (5) minutes with Beale during her visits on June 21, 2011; August 25, 2011; and November 10, 2011, which is one-fifth of the time suggested by the AMA to bill using CPT Code 99214.

181.    M.M.A., who requires translation between English and Spanish, only had the services of an interpreter during her first visit with Beale on May 24, 2011.

182.    Thus, on all three (3) of M.M.A.'s follow-up visits with Beale, the two were unable to communicate verbally even though a requirement of an office visit billed using CPT Code 99214 is that a "detailed" history be obtained.

183.    It was as a result of these office visits for which Beale billed Allstate for services not rendered that Beale prescribed and continued to prescribe physical therapy at Restorative, which also billed Allstate for services not rendered on 135 separate occasions.

184.    Restorative and Beale both submitted claims for payment and medical records to Allstate through the U.S. Mail for services that they did not provide.

185.    Allstate relied on these submissions when adjusting the claims and tendering payment.

## 2.    R.H. (Claim No. 0203296883)

186.    Northwestern submitted several bills to Allstate for the same treatment modalities allegedly rendered to patient R.H. on the same date of service.

187.    For example, for date of service July 8, 2011, Northwestern billed Allstate for the following treatment allegedly provided by occupational therapist Dimple Aggarwall ("Aggarwall"): massage (CPT Code 97124), hot/cold packs (CPT Code 97010), ultrasound (CPT Code 97035), and electrical stimulation (CPT Code 97014).

188.    For the same date of service (July 8, 2011), Northwestern also billed Allstate for the exact same treatment allegedly provided by physical therapist Varghese.

189.    For date of service July 11, 2011, Northwestern billed Allstate for the following treatment allegedly provided by Aggarwall: massage, hot/cold packs, and electrical stimulation.

190.    For the same date of service (July 11, 2011), Northwestern also billed Allstate for the exact same treatment allegedly provided by physical therapist Varghese.

191.    For date of service July 13, 2011, Northwestern billed Allstate for the following treatment allegedly provided by Aggarwall: massage, hot/cold packs, and electrical stimulation.

192.    For the same date of service (July 13, 2011), Northwestern also billed Allstate for the exact same treatment allegedly provided by physical therapist Varghese.

193.    For date of service July 18, 2011, Northwestern billed Allstate for the following treatment allegedly provided by Aggarwall: massage, hot/cold packs, and electrical stimulation.

194.    For the same date of service (July 18, 2011), Northwestern also billed Allstate for the exact same treatment allegedly provided by physical therapist Varghese.

195.    For date of service July 25, 2011, Northwestern billed Allstate for the following treatment allegedly provided by Aggarwall: massage, hot/cold packs, ultrasound, and electrical stimulation.

196.    For the same date of service (July 25, 2011), Northwestern also billed Allstate for the exact same treatment allegedly provided by physical therapist Varghese.

197.    For date of service July 27, 2011, Northwestern billed Allstate for the following treatment allegedly provided by Aggarwall: therapeutic exercises (CPT Code 97530), massage, hot/cold packs, ultrasound, and electrical stimulation.

198.    For the same date of service (July 27, 2011), Northwestern also billed Allstate for the exact same treatment allegedly provided by physical therapist Varghese.

199.    For date of service August 1, 2011, Northwestern billed Allstate for the following treatment allegedly provided by Aggarwall: self-care/home management training and therapeutic exercises (CPT Codes 97530 and 97110).

200.    For the same date of service (August 1, 2011), Northwestern also billed Allstate for the exact same treatment allegedly provided by physical therapist Varghese.

201.    R.H. never received the same treatment twice on the same day.

202.    R.H.'s treatment therapists were two women.

203.    Varghese, who is listed as the rendering provider on half of the above-itemized bills submitted to Allstate, is male.

204.    Thus, Northwestern and Varghese billed Allstate for dozens of services that were not actually provided.

205.    Northwestern submitted claims for payment and medical records to Allstate through the U.S. Mail for these services that it did not actually provide.

206.    Allstate relied on these submissions when adjusting Northwestern's claims.

       **3.**        **C.B. (Claim No. 0240476119)**

207.    Restorative billed Allstate for performing massage (CPT Code 97124) on patient C.B. on at least sixteen (16) separate dates of service, including April 4, 2012; April 6, 2012; April 9, 2012; April 11, 2012; April 13, 2012; April 16, 2012; April 18, 2012; April 20, 2012; April 23, 2012; April 25, 2012; April 27, 2012; April 30, 2012; May 3, 2012; May 7, 2012; May 9, 2012; and May 11, 2012.

208.    C.B. never received massage treatment at Restorative.

209.    Thus, Allstate was billed at least sixteen (16) times for massage treatment that was never rendered.

210.    C.B. began treating at Restorative on April 4, 2012.

211.    C.B. intermittently received ultrasound treatment at Restorative only during her first two weeks of treatment.

212.    Restorative billed Allstate for ultrasound purportedly performed on C.B. for several dates of service beyond C.B.'s first two weeks of treatment, including April 20, 2012; April 23, 2012; April 25, 2012; April 27, 2012; April 30, 2012; May 3, 2012; May 7, 2012; May 9, 2012; and May 11, 2012.

213.    Restorative billed Allstate for at least one dozen ultrasound treatment sessions that did not occur.

214.    Restorative submitted claims for payment and medical records to Allstate through the U.S. Mail seeking reimbursement for the massage and ultrasound services detailed above that were not provided.

215.    Allstate relied on these fraudulent claims and medical records when adjusting Restorative's claims for reimbursement.

### 4.    C.T. (Claim No. 0273135715)

216.    Beale billed Allstate for several examinations of patient C.T. that allegedly occurred at Medical Evaluations, including a level five initial patient examination on January 15, 2013 (CPT Code 99205) and a level four established patient examination on February 19, 2013 (CPT Code 99214).

217.    To bill for a level five office visit, the physician must perform a "comprehensive" physical examination.

218.    To bill for a level four office visit, the physician must perform a "detailed" physical examination.

219.    However, Beale did not examine C.T. at all on either office visit.

220.    Despite not having performed any examination of C.T., Beale represented to Allstate that he performed comprehensive/detailed patient examinations each and every time he submitted bills to Allstate for C.T.'s office visits.

221.    Beale submitted claims for payment and medical records to Allstate through the U.S. Mail seeking reimbursement for services that were not actually rendered to C.T.

222.    Allstate relied on these fraudulent submissions when adjusting Beale's claims for reimbursement.

### 5.     R.W. (Claim No. 0279264246)

223.    Beale billed Allstate for at least two examinations of patient R.W. that allegedly occurred on March 12, 2013 and April 11, 2013.

224.    Beale billed Allstate hundreds of dollars relative to these alleged examinations.

225.    However, Beale did not examine R.W. at all.

226.    Beale represented to Allstate that he performed comprehensive patient examinations each and every time R.W. reported to Beale's office for treatment.

227.    Beale submitted claims for payment and medical records to Allstate through the U.S. Mail seeking reimbursement for services that were not actually rendered to R.W.

228.    Allstate relied on the fraudulent claims and medical records submitted by Beale when adjusting the claims.

6.      **G.P. (Claim No. 0269451258)**

229.    Beale submitted a claim for payment to Allstate for a level five initial patient examination of patient G.P. that allegedly occurred on December 18, 2012.

230.    By AMA definition, a level five office visit requires that a "comprehensive" patient history be taken, a "comprehensive" examination be done, and that the physician employ medical decision-making of "high complexity."

231.    Beale submitted a claim for payment to Allstate through the U.S. Mail representing that he examined G.P. on December 18, 2012 and met all of the prerequisites to bill for a level five office visit.

232.    However, Beale never examined G.P. on December 18, 2012.

233.    Allstate relied on Beale's submission when adjusting the claim.

VII.    **FRAUDULENT MEDICAL SERVICES**

234.    As detailed above, the defendants fraudulently submitted bills to Allstate for treatment and services that they did not actually render.

235.    The defendants also billed Allstate for several services that were not medically necessary based on the patients' actual clinical symptoms and/or that were not performed in accordance with established medical standards of care.

236.    The defendants' goal in treating patients was to perform as much treatment as possible, regardless of whether such treatment was reasonably necessary to their patients' care, recovery, or rehabilitation and/or arose out of a motor vehicle accident, to generate claims for payment against auto insurers like Allstate, as well as to inflate and bolster litigation brought by the attorneys with whom the defendants worked to obtain patients, as discussed *supra*.

237.    To this end, the defendants worked closely together to ensure a cycle whereby they referred their patients to each other.

238.    The medical facility defendants and the physician defendants wrote prescriptions for physical therapy and consistently referred their patients to the PT clinic/physical therapist defendants.

239.    The PT clinic/physical therapist defendants, in turn, referred their patients to the medical facility defendants and the physician defendants for evaluations and examinations.

240.    Despite the fact that almost all of the patients at issue in this Complaint presented to the defendants with soft-tissue injuries that usually require minimal intervention to return the patient to pre-accident status, the medical facility and physician defendants routinely prescribed and the PT clinic and physical therapist defendants performed physical therapy for months on end.

241.    The physical therapy performed, if at all, rarely varied from patient to patient, evidencing that treatment was rendered pursuant to a predetermined protocol that was not individualized to each patient's clinical symptoms and needs.

242.    Several of the medical facility and physician defendants, along with Brennan, also ordered and performed electrodiagnostic testing that was not necessary and was not likely performed as billed.

243.    The full extent of the defendants' misrepresentations regarding the necessity of the treatment they allegedly provided was not known to Allstate until its investigation of the defendants, including discovery of (1) the true interconnectedness of the defendants and the incessant cycle of referrals to each other; (2) the solicitation of accident victims that undermines that patients were truly in need of medical treatment where they only presented to the defendants

27

at the direction of the defendants (or runners/solicitors acting on behalf of the defendants); and (3) the defendants' close relationships with personal injury attorneys who sought to bolster and inflate the value of claims and suits brought against Allstate by relying on the excessive amount of treatment provided by the defendants.

244.    None of these facts is evident within the four corners of the documents submitted to Allstate by the defendants and upon which Allstate relied in adjusting the claims and tendering payment to the defendants.

245.    Each of these facts – cyclical referrals, solicitation, and symbiotic relationships with personal injury attorneys – demonstrate that legitimate medical treatment of motor vehicle accident victims was not the defendants' goal.

246.    These facts, coupled with the defendants' disregard for established standards of medical care, reveal the unnecessary, excessive, unsubstantiated, and unjustified treatment that the defendants rendered, to the extent such treatment was rendered at all.

247.    The unnecessary treatment rendered by the defendants included physical therapy and electrodiagnostic testing, each discussed more fully below, and all treatment that was ancillary to and/or derivative of this unnecessary treatment, including, but not limited to, the treatment set out in the charts annexed hereto at Exhibits 1 to 10.

A.      FRAUDULENT REFERRAL AGREEMENTS BETWEEN THE DEFENDANTS

248.    The defendants depended on each other to perpetrate the scheme to defraud detailed herein.

249.    Once each solicited accident victim became a patient of one of the defendants, that defendant referred the patient to the other defendants for excessive treatment pursuant to the agreement devised by the defendants.

250.    This arrangement was financially beneficial to each of the defendants and is confirmed by the high rate of referral between and among the defendants that negates any argument that the referrals were merely coincidental.

251.    Under Michigan law, physical therapy must be prescribed by an individual licensed to practice dentistry, medicine, osteopathic medicine and surgery, or podiatric medicine and surgery.  Mich. Comp. Laws § 333.17820(1).

252.    Thus, the PT clinic and physical therapist defendants needed the physician defendants to prescribe physical therapy.

253.    Nearly every patient at issue in this Complaint was initially treated by one of the physician defendants at one of the medical facility defendants, subsequently referred for physical therapy at one of the PT clinic defendants, and then referred back to the medical facility defendants for numerous reevaluations and follow-up office visits with Beale, Lutwin, Weingarden, and Oniango.

254.    Each of these physician defendants allegedly provided services to Allstate insureds at and by the medical facility each owns (i.e., Beale through Medical Evaluations, Lutwin through Flint Wellness, Weingarden through Rehabilitation Medicine Group, and Oniango through Tete Oniango, M.D., PLLC).

255.    Lutwin and Oniango also provided services at and by Medical Evaluations for which Allstate was billed.

256.    The medical facility and physician defendants referred more than eighty-three percent (83%) of the patients at issue in this Complaint for physical therapy.  See chart annexed hereto at Exhibit 12.

257.    Of the patients referred for physical therapy, more than half were referred to one or more of the PT clinic defendants.  Id.

258.    Almost forty percent (40%) of the patients at issue in this Complaint treated with Beale and/or at Medical Evaluations, which is owned by Beale.  Id.

259.    Of these, almost eighty-three percent (83%) were referred for physical therapy.  Id.

260.    Of the patients referred for physical therapy by Beale/Medical Evaluations, more than sixty-five percent (65%) were referred to one or more of the PT clinic defendants.  Id.

261.    Lutwin and/or Flint Wellness, which is owned by Lutwin, saw almost twenty percent (20%) of the patients at issue in this Complaint.  Id.

262.    Lutwin and Flint Wellness referred more than eighty-three percent (83%) of their patients for physical therapy.  Id.

263.    Of the total number of patients referred for physical therapy, Lutwin and Flint Wellness referred almost sixty percent (60%) to one or more of the PT clinic defendants.  Id.

264.    Weingarden saw more than eleven percent (11%) of the patients at issue in this Complaint.  Id.

265.    Weingarden referred all of his patients for physical therapy.  Id.

266.    More than half of the patients Weingarden referred for physical therapy were referred to one or more of the PT clinic defendants.  Id.

267.    Oniango saw more than twenty-eight percent (28%) of the patients at issue in this Complaint.  Id.

268.    Oniango referred more than ninety-seven percent (97%) of his patients for physical therapy, including several to the PT clinic defendants.  Id.

269.    Of the patients at issue in this Complaint who treated at Suncare, more than eighty-seven percent (87%) were referred by one or more of the medical facility and/or physician defendants. Id.

270.    Of the patients at issue in this Complaint who treated at Ann Arbor, more than eighty-six percent (86%) were referred by one or more of the medical facility and/or physician defendants. Id.

271.    Of the patients at issue in this Complaint who treated at Progressive, all were referred by one or more of the medical facility and/or physician defendants. Id.

272.    Of the patients at issue in this Complaint who treated at Restorative, more than eighty percent (80%) were referred by one or more of the medical facility and/or physician defendants. Id.

273.    Of the patients at issue in this Complaint who treated at Northwestern, more than eighty-two percent (82%) were referred by one or more of the medical facility and/or physician defendants. Id.

274.    Of the patients at issue in this Complaint who treated at New Era, more than eighty-three percent (83%) were referred by a physician at Flint Wellness, which is owned by Lutwin. Id.

275.    Following physical therapy treatment at the PT clinic defendants, patients were routinely referred back to one of the medical facility or physician defendants, where follow-up evaluations were purportedly performed and renewed physical therapy prescriptions were written.

276.     Thus, the patients referred to the medical facility and physician defendants were referred back to the PT clinic and physical therapy defendants, thus establishing the scheme whereby the defendants cycled their patients to each other for their own pecuniary gain.

277.     There was a significant financial incentive for each defendant to refer to another defendant that would refer the patient back.

278.     This incentive did not exist with respect to providers with whom the defendants did not have a referral agreement.

279.     As such, the extremely high inter-referral rates among the defendants (detailed above and in Exhibit 12) are not surprising and are not merely coincidental.

280.     These widespread referrals undermine any claim by the defendants that the medical services they provided, if at all, were necessary to the care, recovery, and rehabilitation of their patients.

281.     Indeed, there was an undeniable pecuniary incentive for each defendant to perform and refer for as much treatment as possible.

282.     The defendants did, in fact, refer for and perform unwarranted and unnecessary medical treatment, as discussed in the succeeding sections.

**B.     FRAUDULENT PHYSICAL THERAPY**

283.     The referral for and the provision of physical therapy was a central component of the services billed by the defendants.

284.     As an initial matter, much of the physical therapy billed for by the PT clinic defendants was not actually provided, as detailed in section VI *supra*.

285.     Even the physical therapy that was actually rendered was done so fraudulently and unnecessarily.

286.     As discussed *supra*, patients were solicited by the defendants and their agents, thus negating the lawfulness of treatment that was provided to patients who did not seek medical intervention, but instead were coerced to commence treatment by the defendants.

287.     Moreover, patients were used by the defendants to ensure a continuous cycle of referrals that allowed each defendant provider to submit additional claims for payment to Allstate.

288.     Thus, the necessity of any treatment provided is vitiated due to the improper solicitation and referral tactics employed by the defendants.

289.     The physical therapy provided by the PT clinic and physical therapist defendants, and prescribed by the physician defendants, also violated established standards of care.

290.     Specifically, the physical therapy was (1) not documented as warranted, (2) excessive, and (3) performed pursuant to a predetermined protocol that was not tailored to each patient.

### 1.     Unwarranted and Unjustified Physical Therapy

291.     Physical therapy must be objectively indicated.

292.     That is, the patient's subjective complaints of pain are not sufficient to justify more than a few weeks of physical therapy.

293.     Beale, Lutwin, Weingarden, and Oniango frequently prescribed extensive physical therapy based upon patients' subjective symptoms alone.

294.     Beale, Lutwin, Oniango, and Weingarden routinely reported essentially normal findings in their examinations yet rendered diagnoses unsupported by the physical exam that purported to justify extensive physical therapy.

295.     Physical therapy is typically prescribed for musculoskeletal problems.

296.     With respect to the spine, physical therapy is often prescribed for spinal abnormalities such as radiculopathies or degenerative joint diseases.

297.     Such diagnoses are almost never present in the defendants' medical records, which is not surprising as the type of minor motor vehicle accidents in which almost all of the patients were involved rarely result in anything more than soft-tissue injuries, which usually resolve themselves without medical intervention.

298.     Consistent throughout nearly all of the medical records created by the defendants related to the patients at issue herein, there is no documentation to indicate why physical therapy was ordered and certainly no documentation supporting why physical therapy was ordered for the length of time prescribed by the physician defendants.

299.     There is almost no evidence of any significant patient spinal problems such as fractures, tumors, infections, or active radiculopathies.

300.     The physician defendants' physical exams and findings for each patient were also strikingly similar, indicating that the exams were *pro forma* and merely attempts to justify unnecessary treatment.

301.     Like the physician defendants' records, the physical therapy treatment notes consist of mere checklists that fail to substantiate that treatment was rendered in any meaningful way.

302.     Under Michigan law, physical therapy must be prescribed by an individual licensed to practice dentistry, medicine, osteopathic medicine and surgery, or podiatric medicine and surgery.  Mich. Comp. Laws § 333.17820(1).

303.    The physician defendants (each of whom is a medical doctor or osteopathic physician) failed to document why physical therapy was being prescribed for most patients in the first instance.

304.    The physician defendants likewise failed to document why continuing physical therapy was necessary, though the majority of the patients at issue herein were prescribed physical therapy in excess of the community standard of care.

305.    Despite the lack of findings to justify continued physical therapy, the medical facility and physician defendants routinely issued multiple prescriptions beyond the initial prescription.

306.    Thus, both the initial and continuing prescriptions for physical therapy were not documented as warranted.

307.    Physical therapy that is not medically necessary is not compensable under Michigan's No-Fault Act.

### 2.    Excessive Physical Therapy

308.    For the reasons stated above, the physical therapy prescribed by the medical facility and physician defendants and performed by the PT clinic and physical therapist defendants was not necessary in the first instance.

309.    However, assuming *arguendo* that the initial physical therapy sessions were warranted, the defendants continued physical therapy for far longer than the established standard and for far longer than was necessary for their patients' care, recovery, and rehabilitation.

310.    There is almost never a reason to continue physical therapy beyond approximately four to six weeks.

311.    This is especially true where the patient is not showing progress or improvement as a result of the physical therapy, which was almost always the case with the patients at issue herein.

312.    The patients at issue in this Complaint, however, often endured months of physical therapy and dozens and dozens of sessions.

313.    For example, of the patients at issue herein who received physical therapy from one or more of the PT clinic defendants, more than seventy-five percent (75%) received at least two (2) months of physical therapy.  See chart annexed hereto at Exhibit 13.

314.    Of these, more than fifty-seven percent (57%) underwent physical therapy for more than four (4) months.  Id.

315.    Several patients endured more than six (6) months of physical therapy, including some patients who treated for a year or more.  Id.

316.    The excessive nature of the physical therapy prescribed by the medical facility and physician defendants and allegedly performed by the PT clinic and physical therapist defendants is also demonstrated by the number of physical therapy sessions that occurred.

317.    Indeed, of the patients at issue herein who received physical therapy at one or more of the PT clinic defendants, more than fifty-six percent (56%) received at least twenty (20) physical therapy sessions.  Id.

318.    Of these patients, almost half received in excess of 50 physical therapy sessions.  Id.

319.    Several patients received more than 75 physical therapy sessions.  Id.

320.    Twenty (20), and certainly 50 or more, physical therapy sessions is in excess of the established standard.

321.    This number of physical therapy sessions is particularly excessive given that physical therapy is usually helpful within the first few weeks or not at all.

322.    After the approximate sixth visit, a determination should be made as to whether the physical therapy is helping the patient.

323.    If physical therapy has not helped the patient by that time, it is unlikely to do so in the future and may instead actually be detrimental to the patient's recovery.

324.    The high number of physical therapy sessions done by the PT clinic and physical therapist defendants is also excessive given that the purpose of physical therapy is to allow the patient to perform the exercises at home as part of a home exercise program.

325.    Indeed, once a patient can safely, effectively, and independently perform physical therapy exercises at home, there is no need for the patient to continue with in-office visits.

326.    The PT clinic and physical therapist defendants did not establish home exercise programs for their patients.

327.    A provider's decision to continue in-office physical therapy does not establish necessity for the same.

328.    For all of these reasons, the physical therapy prescribed by the medical facility and physician defendants and rendered by the PT clinic and physical therapist defendants, if at all, was excessive and not medically necessary.

### 3.    Physical Therapy Was Rendered Pursuant to a Predetermined Protocol

329.    Healthcare treatment should be tailored to the symptoms and clinical needs of each patient.

330.    The PT clinic and physical therapist defendants, however, relied on a predetermined protocol when providing physical therapy services that necessarily did not take into account each patient's individual needs.

331.    Instead, the same treatment modalities were provided over and over and to almost all patients.

332.    Not only was there little variance across patients, each individual patient's treatment plan rarely changed over the course of that patient's treatment, despite the fact that several patients treated for months and had dozens and dozens of sessions.

333.    For example, almost every single patient at issue herein received the following treatment modalities: electrical stimulation (CPT Code 97014), ultrasound (CPT Code 97035), massage (CPT Code 97124), hot/cold packs (CPT Code 97010), and therapeutic exercises (CPT Code 97110).

334.    These modalities are highly generic.

335.    Although it is well established that stretching and physical exercise are the primary forms of treatment for soft-tissue injuries of the neck and back, the predetermined protocol utilized by the PT clinic and physical therapist defendants was heavily reliant on passive modalities (e.g., electrical stimulation, ultrasound, massage, and hot/cold packs) that permitted them to submit multiple charges to Allstate without truly improving the health of their patients.

336.    The medical community universally follows the doctrine of evidence-based medicine.

337.    That is, if a service or treatment is not documented in a patient's medical file, then it was not performed.

338.     The documentation from the defendants fails to specify exactly what was done and why during each physical therapy session.

339.     Moreover, as noted above, there was no effort made by the defendants to shift the patients to a home exercise program.

340.     The predetermined nature of the physical therapy treatment prescribed for Allstate insureds by Beale, Lutwin, Oniango, and Weingarden is further evidenced by the fact that the physician defendants prescribed a fixed amount of physical therapy treatment regardless of the severity of each patient's underlying injury.

### 4.     Exemplar Claims

341.     The following patients are representative of the multitude of the defendants' patients where physical therapy proceeded for far longer than recommended, without indication, and pursuant to a predetermined protocol.

342.     Additional examples of the excessive and predetermined nature of the physical therapy rendered can also be found on the chart annexed hereto at Exhibit 14, including the redundant physical therapy modalities performed by the defendants, if at all.

### a.     J.A. (Claim No. 0211135397)

343.     Patient J.A. was evaluated by Beale at Medical Evaluations for a sprained ankle.

344.     Beale wrote at least five (5) physical therapy prescriptions related to J.A.

345.     J.A. commenced physical therapy at Ann Arbor on or about August 9, 2011, which continued for more than seven (7) months and 57 sessions.

346.     Beale reevaluated J.A. on several occasions and always prescribed additional physical therapy, despite the fact that Beale noted during the October 27, 2011 office visit that "physical therapy has provided her with no relief."

39

347.    Despite Beale's admission that physical therapy was not helping J.A., Beale continued to prescribe physical therapy treatment for an additional five (5) months.

348.    By the time of the October 27, 2011 evaluation, J.A. had been receiving physical therapy for two and a half months.

349.    Thus, it should have been, and was as evidenced by Beale's finding, apparent that physical therapy was not helping J.A.

350.    Nonetheless, Beale continued to prescribe and Ann Arbor continued to render physical therapy for an additional five (5) months.

351.    Such excessive physical therapy was objectively unnecessary as outside the standard of care.

352.    Such excessive physical therapy was also subjectively unnecessary as Beale himself found that the physical therapy was not helping J.A.

353.    Thus, Beale and Ann Arbor continued physical therapy for their own financial gain and not because it was necessary to J.A.'s care, recovery, or rehabilitation.

354.    Beale and Ann Arbor submitted claims for payment and medical records to Allstate through the U.S. Mail related to the unnecessary and contraindicated treatment rendered to J.A.

355.    Allstate relied on these submissions when adjusting the claims and tendering payment.

### b.    C.J. (Claim No. 0248174369)

356.    Beale purportedly saw patient C.J. at Medical Evaluations and referred him for physical therapy at Progressive.

40

357.    Beale wrote a total of nine (9) prescriptions for physical therapy relative to C.J., each for at least three (3) physical therapy sessions per week ranging from between four (4) and eight (8) weeks each prescription.

358.    C.J. received physical therapy for a period of eight (8) months and a total of 106 sessions.

359.    Beale failed to document why such extensive physical therapy was warranted.

360.    Progressive likewise failed to document why so many physical therapy sessions were necessary and why C.J. could not transition to a home exercise program.

361.    Progressive also repeated the same few modalities over and over related to C.J.: ultrasound, massage, hot/cold packs, therapeutic exercises, and traction.

362.    There was little variation in C.J.'s treatment despite its long duration.

363.    Moreover, C.J.'s treatment was the same as almost every patient at issue in this Complaint and was largely passive.

364.    The unjustified, excessive, and predetermined physical therapy rendered to C.J. was unnecessary and not compensable under Michigan's No-Fault Act.

365.    Nonetheless, Beale and Progressive submitted claims for payment and medical records to Allstate through the U.S. Mail related to C.J.

366.    Allstate relied on these submissions in adjusting the claims.

### c.    D.H. (Claim No. 0220257265)

367.    Patient D.H. began physical therapy treatment at Ann Arbor on or about September 26, 2011 and continued to seek treatment at Ann Arbor through January 3, 2013, a period of more than fifteen (15) months.

368.    Beale wrote a total of six (6) prescriptions related to D.H., each calling for between six (6) and eight (8) weeks of physical therapy at a frequency of three (3) times per week.

369.    In total, D.H. received over fifteen (15) months of treatment at Ann Arbor and 78 separate sessions.

370.    Both the duration and the frequency of D.H.'s physical therapy was excessive, particularly as Beale and Ann Arbor failed to document adequately why physical therapy was necessary at all.

371.    Moreover, the physical therapy provided to D.H. adhered to the predetermined protocol used by Ann Arbor and the other PT clinic defendants: electrical stimulation, ultrasound, massage, hot/cold packs, and therapeutic exercises.

372.    Ann Arbor submitted numerous claims for payment and medical records to Allstate through the U.S. Mail seeking reimbursement for the excessive and medically unnecessary physical therapy treatment allegedly provided to D.H.

373.    Beale also submitted claims for payment and medical records to Allstate through the U.S. Mail related to the eight (8) evaluations he purportedly performed of D.H. and the six (6) physical therapy prescriptions he wrote.

374.    Allstate relied on these submissions when adjusting the claims and tendering payment.

### d.    L.M. (Claim No. 0233659820)

375.    Patient L.M. began treatment at New Era on or about February 6, 2012 and continued treatment through October 8, 2012.

376.     Employees of Flint Wellness, owned by Lutwin, prescribed and re-prescribed a fixed regimen of physical therapy treatment for L.M. lasting four (4) weeks with a frequency of three (3) visits per week each prescription.

377.     The Flint Wellness physicians failed to document why such physical therapy was necessary or warranted.

378.     In total, L.M. received over eight (8) months and 79 sessions of physical therapy treatment at New Era.

379.     Over eight (8) months of physical therapy treatment is excessive and, therefore, not medically necessary.

380.     There is no indication in New Era's or Flint Wellness's records as to why L.M. could not safely, effectively, and independently perform physical therapy as part of a home exercise program.

381.     Moreover, there was almost no variation in the physical therapy modalities applied to L.M. despite the fact that her treatment lasted for more than eight (8) months.

382.     Indeed, at nearly every visit, L.M. received the following: electrical stimulation, ultrasound, massage, hot/cold packs, and therapeutic exercises.

383.     New Era and Flint Wellness submitted numerous claims for payment and medical documents to Allstate through the U.S. Mail for the excessive and medically unnecessary treatment allegedly provided to L.M.

384.     Allstate relied on these submissions when adjusting the claims and tendering payment.

### e.     M.J. (Claim No. 0190640466)

385.     Patient M.J. was evaluated by Weingarden at Rehabilitation Medicine Group.

386.    Weingarden referred M.J. for physical therapy at Progressive multiple times, writing five (5) separate prescriptions.

387.    Weingarden did not document why M.J. required physical therapy or why he required so much physical therapy.

388.    M.J. received physical therapy at Progressive for a total of seven (7) months and forty-six (46) sessions, both of which are far in excess of the established standard for physical therapy treatment.

389.    Without any explanation, M.J. received the same four modalities over and over throughout the course of his several months of physical therapy: ultrasound, massage, hot/cold packs, and therapeutic exercises.

390.    There was no reason given by Weingarden or Progressive why M.J. could not safely, effectively, and independently continue physical therapy as part of a home exercise program instead of continuing in-office treatment for months.

391.    Rehabilitation Medicine Group and Progressive submitted numerous claims to Allstate through the U.S. Mail seeking reimbursement for the excessive and medically unnecessary treatment allegedly provided to M.J.

392.    Weingarden knew that his records would be sent to Allstate through the U.S. Mail.

393.    Allstate relied on these submissions when adjusting the claims and tendering payment.

### f.    W.W. (Claim No. 0254098667)

394.    Patient W.W. began physical therapy treatment at Restorative on or about August 7, 2012 and continued to seek treatment at Restorative through March 29, 2013.

395.    Lutwin prescribed and re-prescribed a fixed regimen of physical therapy treatment for W.W. lasting four (4) weeks with a frequency of at least three (3) visits per week for each prescription.

396.    Lutwin issued at least four (4) physical therapy prescriptions relative to W.W. without explanation for why such physical therapy was necessary and continued to be necessary at the time of each subsequent prescription.

397.    In total, W.W. received over seven (7) months and 79 sessions of treatment at Restorative.

398.    Moreover, on nearly every visit W.W. made to Restorative, Allstate was billed by Restorative for the same modalities.

399.    Over seven (7) months of identical physical therapy treatment is excessive and not medically necessary.

400.    Restorative and Lutwin submitted numerous claims for payment to Allstate through the U.S. Mail seeking reimbursement for excessive and medically unnecessary treatment allegedly provided to W.W.

401.    Allstate relied on these submissions when adjusting the claims and tendering payment.

g.    **J.W. (Claim No. 0185534088)**

402.    Patient J.W. was first seen by Oniango at Tete Oniango, M.D., PLLC on or about December 8, 2010.

403.    Oniango immediately referred J.W. for physical therapy, which J.W. commenced on December 10, 2010.

404.     Oniango prescribed and re-prescribed a fixed regimen of physical therapy treatment for J.W. lasting from four (4) to eight (8) weeks with a frequency of at least three (3) visits per week for each prescription.

405.     In total, Oniango wrote nine (9) prescriptions for physical therapy.

406.     J.W. received physical therapy at Suncare and Northwestern for a total of more than a year and 101 sessions.

407.     Moreover, on nearly every visit J.W. made to Suncare and Northwestern, Allstate was billed for the same modalities.

408.     J.W.'s physical therapy treatment did not change over the course of her year of treatment, indicating that the physical therapy was not helping and, thus, was not necessary for her care, recovery, or rehabilitation.

409.     Nor did J.W. transition to a home care plan of physical therapy, despite the fact that neither Suncare or Northwestern documented why J.W. would not be able to safely, effectively, and independently perform the exercises at home.

410.     Over a year of identical physical therapy treatment is excessive and, therefore, not medically necessary.

411.     Tete Oniango, M.D., PLLC, Suncare, and Northwestern submitted numerous claims to Allstate through the U.S. Mail seeking reimbursement for the excessive and medically unnecessary treatment allegedly provided to J.W.

412.     Allstate relied on these submissions when adjusting the claims and tendering payment.

**h.      C.S. (Claim No. 0273588194)**

413.    Patient C.S. was examined by Lutwin at Medical Evaluations, who referred him for physical therapy at Restorative, but did not justify why physical therapy was warranted.

414.    C.S. received physical therapy at Restorative for more than six (6) months and 87 sessions.

415.    Like the other patients at issue in this Complaint, C.S. received the same few modalities over and over again without explanation as to why these treatments were necessary and without variation to correspond to C.S.'s expected progression as his physical therapy continued.

416.    Over six (6) months of a fixed protocol of physical therapy treatment is excessive and not medically necessary.

417.    Lutwin and Restorative submitted claims for payment and medical records to Allstate through the U.S. Mail relative to the excessive treatment purportedly provided to C.S.

418.    Allstate relied on these submissions when adjusting the claims.

**i.      H.F. (Claim No. 0220939540)**

419.    Beale wrote several prescriptions for physical therapy relative to H.F., each prescribing eight (8) weeks of physical therapy at a frequency of three (3) sessions per week.

420.    Beale did not document why H.F. required physical therapy in the first place, let alone why she required twenty-four (24) weeks of physical therapy.

421.    H.F. received physical therapy at Ann Arbor for a total of seven (7) months and forty (40) sessions.

422.    Patient H.F. began treatment at Ann Arbor on or about September 2, 2011 and continued to treat there through April 5, 2012.

423.     On nearly every visit H.F. made to Ann Arbor, Allstate was billed for the same modalities without any variation to take into account H.F.'s progress.

424.     There is nothing in the records from Beale or Ann Arbor regarding why H.F. could not have safely, effectively, and independently continued physical therapy as part of a home exercise program.

425.     Seven (7) months of a fixed protocol of physical therapy treatment is excessive and not medically necessary.

426.     Moreover, the most recent physical therapy prescription form submitted to Allstate by Ann Arbor was dated December 15, 2011 and prescribed eight weeks of physical therapy treatment.

427.     Allstate received a bill for physical therapy treatment allegedly rendered to H.F. at Ann Arbor on April 5, 2012, which is well over eight (8) weeks from the mid-December prescription.

428.     Thus, Ann Arbor rendered physical therapy treatment to H.F. without a valid prescription in violation of Michigan law.

429.     All physical therapy services allegedly provided by Ann Arbor without a prescription by Beale (or another physician) were not lawfully rendered and, thus, are not compensable under Michigan's No-Fault Act.

430.     Beale and Ann Arbor submitted claims for payment and medical records to Allstate through the U.S. Mail for treatment was not medically necessary and was not lawfully rendered.

431.     Allstate relied on these submissions when adjusting the claims.

C.      **FRAUDULENT ELECTRODIAGNOSTIC TESTING**

432.      The defendants referred for and allegedly performed a significant number of electrodiagnostic tests on the Allstate insureds at issue herein.

433.      Brennan and Weingarden in particular performed much of the electrodiagnostic testing that was done, including at and by Medical Evaluations, Flint Wellness, and Rehabilitation Medicine Group.

434.      Electrodiagnosis is the branch of medicine that measures electrical potentials from nerves and muscles to determine if there is inherent pathology.

435.      Electrodiagnostic testing includes electromyography (EMG) and nerve conduction studies (NCS).

436.      EMG testing involves the use of an electromyography machine to record the electrical activity of a skeletal muscle to evaluate the existence of muscle and/or nerve abnormalities.

437.      An EMG is an invasive procedure that involves the insertion of a small needle electrode directly into an individual muscle.

438.      There are at least two components to a properly administered EMG test.

439.      First, after the needle is inserted below the skin, the muscle is examined at rest.

440.      In a normal muscle at rest, there is some reaction to the muscle when the needle is first pushed through the surface of the muscle and then the muscle becomes "silent."

441.      A damaged muscle – or a muscle that has experienced disruption of its normal nerve stimulation, as occurs in neuropathy or radiculopathy – continues to produce electric charges even at rest.

442.     The second component of the EMG test measures the electrical activity that occurs when the muscle is activated by a motor nerve.

443.     In a healthy muscle, a voluntary muscle movement produces a measurable electrical charge.

444.     If the nerve or root has been damaged, then some part of the muscle signal may be missing or abnormal.

445.     To perform a NCS, the clinician must measure nerve impulses following nerve stimulation and obtain information regarding the speed (i.e., velocity), timing, and strength (i.e., amplitude) of nerve impulses.

446.     NCS involve non-invasive tests in which peripheral nerves in the upper and lower limbs (i.e., arms and legs) are stimulated through the skin by the application of an electrical current.

447.     A brief shock is then delivered at a measured distance from the recording electrodes to stimulate the nerve, causing it to conduct an electrical wave of depolarization down each respective nerve.

448.     The velocity, amplitude, and shape of the response are then recorded by the recording electrodes attached to the surface of the skin.

449.     The electrical characteristics of the nerve responses are compared with well-defined normal responses to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers of peripheral nerves in the arms and legs.

450.     The results of Brennan's and Weingarden's EMG and NCS testing and their underlying medical records reflect predominantly unjustified testing resulting in a pattern of excess testing and unwarranted, and sometimes impossible, findings.

451.    The electrodiagnostic testing performed by Brennan and Weingarden was unnecessary and problematic in several respects.

452.    First, such testing was not warranted or indicated based on the referring physician defendants' own findings and each patient's symptoms.

453.    Second, the electrodiagnostic testing that was done was excessive, was not likely performed as billed, and the results of which contain unsupported and incredible results.

454.    Finally, the EMG and NCS that were done did not in any way affect patient treatment, thus rendering them unnecessary.

    **1.**    **Unwarranted EMG and NCS Testing Not Supported by Documented Findings**

455.    For EMG and NCS testing to be medically justified, the clinical examination must indicate symptoms or signs of radiculopathy.

456.    Radiculopathy is a pathological condition of the nerve roots where one or more root nerves along the spine become damaged causing radiating pain to the part of the body served by the particular nerve.

457.    Essentially, a radiculopathy is what is known as a "pinched nerve."

458.    The patient's subjective symptoms alone cannot support the performance of an electrodiagnostic study absent objective findings by the practitioner because such studies are an extension of the clinical exam.

459.    EMG and NCS studies are reserved for cases of actual neurologic abnormalities.

460.    EMG and NCS are not indicated where, as was the case with almost every patient at issue herein, neurologic deficits are not detected.

461.    The medical facility and physician defendants routinely ordered EMG and NCS testing in the absence of any objective findings of abnormal neurology.

51

462.    Nor did the physician defendants perform adequate physical evaluations to justify electrodiagnostic testing or ascertain a history of symptoms that would support EMG or NCS testing.

463.    The physician defendants' examinations, for example, were extremely limited and the accompanying documentation merely reflects that they generically described the patients' pain and lack of range of motion.

464.    The physician defendants' own findings rarely document that adequate symptomology existed to justify EMG or NCS testing.

465.    If there is no history and physical evidence of a significant radiculopathy, as is the case for almost all of the patients at issue herein, there is nothing to be learned from the EMG that is of clinical significance.

466.    Patients of the defendants underwent EMG and NCS testing even when objective symptoms or signs of radiculopathy were absent from the clinical examination.

467.    The absence of objective symptoms and signs of radiculopathy in the patients at issue herein is not surprising because the entirety of the patients purported to be injured in motor vehicle accidents, usually minor accidents.

468.    Motor vehicle accidents only rarely cause neuropathy.

469.    A recently published study examined the frequency of radiculopathy in motor vehicle accident patients.  Randall L. Braddom, et al., Frequency of Radiculopathies in Motor Vehicle Accidents, 39 Muscle & Nerve 545-547 (2009).

470.    The study found that motor vehicle trauma causes a slight increase over the baseline rate of cervical radiculopathy (8%) compared to non-motor vehicle accident patients

(6%) and that the frequency of lumbar radiculopathy in the two populations was the same (12%).  Id.

471.   Therefore, cervical radiculopathy is only rarely caused by a motor vehicle accident and motor vehicle accidents do not cause a significant increase in the frequency of lumbar radiculopathy.

472.   Consequently, the lack of objective symptoms and signs of radiculopathy in the defendants' patients is consistent with the documented reality that motor vehicle accidents rarely cause radiculopathies.

473.   Thus, the medical facility and physician defendants subjected their patients to unnecessary pain and risk of infection and billed Allstate for unnecessary and unjustified EMG and NCS testing.

## 2. Unlikely and Incredible Electrodiagnostic Testing Reports and Results

474.   On several occasions, Brennan and Weingarden reported testing up to 60 muscles per patient per date of service.

475.   This is both incredible and unlikely as it would involve the insertion of up to 60 needles into a patient's muscles during a single visit (one needle for each muscle tested).

476.   In addition to being extremely time consuming and painful, the testing of 60 muscles is excessive to make a diagnosis, which is usually done based on the testing of six (6) to eight (8) muscles in an extremity.

477.    The results of the electrodiagnostic tests conducted by Brennan and Weingarden are likewise unlikely and include impossible data, thus rendering such results and findings meaningless.

478.    The results of the testing inordinately contained findings of bilateral radiculopathy, despite the lack of radiculopathy found by the examining physician defendants and despite the fact that Brennan's and Weingarden's own generated results did not support a diagnosis of radiculopathy.

479.    The results of the EMG studies demonstrate their lack of medical necessity given that the results are either normal or cite a finding of "1+ positive waves," which is considered a normal finding as well.

480.    A finding of 1+ positive waves does not carry any clinical significance and merely indicates that the electromyographer should investigate further for more significant changes.

481.    Moreover, it is impossible to detect "1+ positive waves" in the paraspinal muscles as Brennan and Weingarden reported at times.

482.    The EMGs for the patients of Brennan and Weingarden followed a predictable pattern, including findings of clinically inconsequential "1+ positive waves," unsupported diagnoses of radiculopathies, and excessive numbers of muscles tested.

### 3.    Electrodiagnostic Testing Was Performed Pursuant to a Predetermined Protocol and Did Not Affect Treatment

483.    The defendants routinely ordered medical services and diagnostic tests, including EMG and/or NCS studies, based upon the initial examinations of each patient.

484.    Electrodiagnostic testing is an extension of the clinical exam and should be used, if at all, in accordance with a patient's individualized objective symptoms.

485.    The nature and number of the peripheral nerves and the types of nerve fibers tested in a NCS should be dynamic (i.e., varied from patient to patient), and should never be based on a predetermined protocol.

486. Likewise, the provision of EMG tests should not be conducted pursuant to a predetermined protocol of muscles to be tested.

487. Such a protocol-based approach to electrodiagnostic testing can lead to overutilization of such testing, as happened here.

488. Overutilization of invasive electrodiagnostic studies subjects patients to unnecessary pain and exposes them to unnecessary risk for infection.

489. The defendants displayed the use of a protocol approach when submitting their patients to electrodiagnostic testing.

490. Specifically, the defendants referred patients for electrodiagnostic testing even if they did not present with any neurological deficits or any other objective symptoms indicating a suspected radiculopathy, supporting that such referrals were made on the basis of a predetermined protocol.

491. The *pro forma* nature of the defendants' referrals for electrodiagnostic testing are evidenced by the fact that the results of the EMG and NCS testing were almost never used to affect or influence patient treatment.

492. That is, the physician defendants ordered EMG and NCS, but did not use the results to adjust or direct each patient's treatment plan.

493. Indeed, in several instances, the defendants established a treatment plan (almost always involving physical therapy, as discussed above) before electrodiagnostic testing was ordered and before the results of the testing were known.

494. These treatment plans almost never changed even after the EMG/NCS results came back.

495.    If the defendants were capable of establishing treatment plans and their treatment plans never changed based on the electrodiagnostic testing done, the EMG and NCS studies were not medically necessary as they did not in any way influence or aid the care, recovery, or rehabilitation of each patient.

### 4.    Exemplar Claims

496.    The following patients exemplify the issues with the electrodiagnostic testing that was done and which are prevalent across all of the patients at issue herein who received EMG/NCS testing.

### a.    A.G. (Claim No. 0220257265)

497.    Patient A.G. received both EMG and NCS testing from Brennan at Medical Evaluations on June 8, 2012.

498.    Beale ordered the EMG/NCS testing for A.G. despite the fact that she never presented with any objective symptoms of radiculopathy.

499.    To the contrary, during the eight (8) months leading up to the EMG/NCS testing, Beale consistently noted in his patient evaluation records that A.G. "is negative for radiculopathy."

500.    Despite a lack of objective symptoms indicating the existence of radiculopathy, Beale nonetheless ordered EMG/NCS testing for A.G.

501.    Brennan allegedly performed needle EMG testing on twenty-two (22) separate muscles in patient A.G.

502.    Normally, testing six (6) to eight (8) muscle groups per extremity will suffice for a determination of radiculopathy.

503.    An EMG study of twenty-two (22) muscles would have required that twenty-two (22) needles be inserted into A.G.'s muscles in a single session, which would have been highly painful and is unlikely.

504.    The excessive EMG testing performed by Brennan subjected A.G. to unnecessary pain and was not medically necessary.

505.    Moreover, Brennan's EMG findings were all normal or 1+ waves, which is a normal finding.

506.    Despite these normal results, Brennan diagnosed A.G. with left C-7 radiculopathy.

507.    In addition to being unwarranted in the first instance (as Beale found that A.G. had no symptoms of radiculopathy) and being excessively performed, the EMG/NCS also failed to affect A.G.'s treatment.

508.    A.G. began physical therapy treatment at Ann Arbor on September 26, 2011, more than eight (8) months prior to the performance of the EMG/NCS testing by Brennan.

509.    A.G. continued to receive the same protocol of physical therapy treatment at Ann Arbor even after her EMG/NCS.

510.    Thus, the EMG/NCS testing performed by Brennan had no effect on A.G.'s treatment regimen and, therefore, was medically unnecessary and not compensable under the Michigan No-Fault Act.

511.    Medical Evaluations submitted claims for payment and medical documentation to Allstate through the U.S. Mail seeking reimbursement for the medically unnecessary EMG/NCS testing allegedly performed on A.G. by Brennan.

512.    Brennan knew that his reports would be sent to Allstate through the U.S. Mail.

513.     Allstate relied on these fraudulent submissions when adjusting the claims.

**b.      M.M.A. (Claim No. 0204672422)**

514.     Patient M.M.A. received EMG and NCS testing from Brennan at Medical Evaluations on August 5, 2011.

515.     Brennan purportedly performed needle EMG testing on twenty-two (22) separate muscles relative to M.M.A.

516.     This would have required the insertion of twenty-two (22) needles into M.M.A.'s muscles on a single date of service.

517.     Testing more than six (6) to eight (8) muscles during an EMG study is rarely necessary and subjects the patient to unnecessary pain and risk of infection.

518.     Allstate was also billed by Restorative for physical therapy treatment that allegedly occurred on the same day that twenty-two needles were inserted into M.M.A.'s muscles.

519.     Brennan's findings indicate entirely normal results for both the EMG and NCS studies performed on M.M.A.

520.     Brennan stated in his interpretative report that his "normal" findings "are consistent with this patient's history and physical examination findings."

521.     Thus, there was no indication to refer M.M.A. for electrodiagnostic testing in the first place.

522.     Nor were the EMG or NCS necessary to establish M.M.A.'s treatment plan.

523.     Beale initially prescribed physical therapy treatment for M.M.A. on May 24, 2011.

524.     M.M.A. treated at Restorative for over two (2) months and attended at least twenty-five (25) physical therapy sessions at Restorative prior to receiving the EMG/NCS testing from Brennan.

525.     For all of these reasons, the electrodiagnostic studies done of M.M.A. were unnecessary in every respect.

526.     Medical Evaluations submitted claims for payment and medical documentation to Allstate through the U.S. Mail seeking reimbursement for the medically unnecessary EMG/NCS testing allegedly performed on M.M.A. by Brennan.

527.     Brennan knew that his reports would be sent to Allstate through the U.S. Mail.

528.     Allstate relied on these submissions when adjusting the claims.

### c.      D.B. (Claim No. 0235750825)

529.     Lutwin ordered EMG testing for patient D.B., which was performed by Brennan.

530.     Brennan allegedly performed EMG studies on forty-three (43) separate muscles.

531.     Inserting forty-three (43) needles in a single sitting subjected D.B. to unnecessary pain and risk of infection.

532.     Studying six (6) to eight (8) muscles in an extremity is more than sufficient to diagnose radiculopathy.

533.     Studying forty-three (43) separate muscles is clearly excessive and, therefore, not medically necessary.

534.     Brennan's EMG studies showed normal or 1+ positive waves, which equates to a finding of normal.

535.     Despite the normal findings of his EMG studies, Brennan diagnosed D.B. with three different radiculopathies.

536.     D.B. was initially prescribed physical therapy treatment by Lutwin on March 2, 2012.

537.     Prior to receiving EMG/NCS testing from Brennan on March 30, 2012, D.B. had already reported for seven (7) sessions of physical therapy treatment.

538.     Following the performance of EMG/NCS testing by Brennan, Lutwin continued to refer D.B. for several months of physical therapy treatment.

539.     Thus, D.B.'s treatment plan was already established a month before the electrodiagnostic testing and did not change after such testing (even though Brennan made bogus diagnoses of radiculopathy), demonstrating that the EMG/NCS testing was not necessary to D.B.'s care, recovery, or rehabilitation.

540.     Medical Evaluations submitted claims for payment and medical documentation to Allstate through the U.S. Mail seeking reimbursement for the medically unnecessary EMG/NCS testing allegedly rendered to D.B. by Brennan.

541.     Brennan knew that his findings and report would be submitted to Allstate through the U.S. Mail.

542.     Allstate relied on these fraudulent submissions by Brennan and Medical Evaluations when adjusting the claims.

**d.      L.M. (Claim No. 0233659820)**

543.     Patient L.M. received EMG/NCS testing from Brennan at Flint Wellness on June 26, 2012.

544.     L.M. was referred for electrodiagnostic testing by Andrew Ruden, M.D. ("Ruden"), a physician at Flint Wellness, despite the fact that Ruden consistently noted in his patient evaluation records that L.M. presented without signs of radiculopathy.

545. Thus, the EMG/NCS testing ordered for L.M. by Ruden was not justified from the outset.

546. Brennan's needle EMG testing results were all normal for L.M.

547. In fact, Brennan noted in his interpretative report that his normal findings "are consistent with this patient's history and physical examination findings," further negating the necessity to perform electrodiagnostic testing in the first place.

548. Nor was the EMG/NCS testing that was done necessary to determine L.M.'s treatment plan.

549. L.M. began physical therapy treatment at New Era on February 6, 2012, over four (4) months prior to the performance of the EMG/NCS testing by Brennan.

550. L.M. continued to receive the same fixed protocol of physical therapy treatment at New Era for an additional four (4) months following the performance of the EMG/NCS testing by Brennan.

551. Accordingly, the EMG/NCS testing performed by Brennan on L.M. did not affect L.M.'s treatment regimen and was not necessary to L.M.'s care, recovery, and rehabilitation.

552. Flint Wellness submitted claims for payment and medical documentation to Allstate through the U.S. Mail seeking reimbursement for the medically unnecessary EMG/NCS testing performed on L.M. by Brennan.

553. Brennan knew that his findings and report would be transmitted to Allstate through the U.S. Mail.

554. Allstate relied on these fraudulent submissions when adjusting the claims and tendering payment to Flint Wellness.

### e.      J.H. (Claim No. 0238443170)

555.    Patient J.H. received EMG/NCS testing from Brennan at Medical Evaluations on January 13, 2012.

556.    Brennan's EMG testing results were all normal for J.H.

557.    In fact, Brennan noted in his interpretative report that the "essentially normal exam" was "consistent with this patient's history and physical examination findings."

558.    Thus, the EMG was not warranted in the first place as J.H. did not present with symptoms that justified use of electrodiagnostic testing.

559.    Brennan allegedly performed EMG testing on twenty (20) separate muscles in patient J.H.

560.    Normally, testing six (6) to eight (8) muscle groups per extremity will suffice for a determination of radiculopathy.

561.    The excessive EMG testing performed by Brennan subjected J.H. to unnecessary pain and risk of infection and was not medically necessary.

562.    Nor did the EMG testing affect J.H.'s treatment plan, which was already in place prior to the EMG.

563.    J.H. began physical treatment at Ann Arbor on December 21, 2011, nearly one (1) month prior to the performance of the EMG/NCS testing by Brennan.

564.    J.H. continued to receive the same fixed protocol of physical therapy treatment at Ann Arbor for an additional three (3) months following the performance of EMG/NCS testing by Brennan.

565.    Accordingly, the EMG/NCS testing performed by Brennan on J.H. did not affect J.H.'s treatment regimen and was not necessary to J.H.'s care, recovery, and rehabilitation.

566.    Medical Evaluations submitted claims for payment and medical documentation to Allstate through the U.S. Mail seeking reimbursement for the medically unnecessary EMG/NCS testing performed on J.H. by Brennan.

567.    Allstate relied on the fraudulent claims for reimbursement and medical documents submitted by Medical Evaluations when adjusting the claims for payment.

**f.      B.A. (Claim No. 0211459243)**

568.    Patient B.A. received EMG/NCS testing from Weingarden at Rehabilitation Medicine Group on March 7, 2012.

569.    Weingarden performed EMG/NCS testing on B.A. despite the fact that B.A. never presented with any objective symptoms of radiculopathy.

570.    Thus, the electrodiagnostic testing was not indicated in the first instance.

571.    Nor did the EMG/NCS testing in any way influence or aid B.A.'s treatment.

572.    B.A. began physical therapy treatment at Restorative on August 18, 2011, almost seven (7) months prior to the performance of the EMG/NCS testing by Weingarden.

573.    In fact, B.A. had completed his entire regimen of physical therapy treatment prior to the performance of EMG/NCS testing by Weingarden

574.    Accordingly, the EMG/NCS testing performed by Weingarden on B.A. was not related to B.A's care, recovery, and rehabilitation and, therefore, is not compensable under the Michigan No-Fault Act.

575.    Weingarden submitted claims for payment and medical documentation to Allstate through the U.S. Mail seeking reimbursement for the medically unnecessary EMG/NCS testing performed on B.A.

576.    Allstate relied on these fraudulent submissions when adjusting the claims.

g.      S.T. (Claim No. 0211459243)

577.    Patient S.T. received EMG/NCS testing from Weingarden at Rehabilitation Medicine Group on October 6, 2011.

578.    This electrodiagnostic testing was not necessary for S.T.'s care, recovery, and rehabilitation.

579.    Indeed, Weingarden initially prescribed physical therapy treatment for S.T. on August 31, 2011.

580.    S.T. attended at least seventeen (17) physical therapy sessions at Restorative prior to receiving EMG/NCS testing from Weingarden.

581.    Moreover, S.T. continued to receive the same fixed protocol of physical therapy treatment at Restorative for an additional forty-six (46) physical therapy sessions following the EMG/NCS testing by Weingarden.

582.    Accordingly, the EMG/NCS testing performed by Weingarden had no effect on the treatment regimen of S.T. and, therefore, was medically unnecessary and not compensable under the Michigan No-Fault Act.

583.    Weingarden submitted claims for payment and medical documentation to Allstate through the U.S. Mail seeking reimbursement for the  medically unnecessary EMG/NCS testing allegedly performed on S.T..

584.    Allstate relied on these fraudulent submissions when adjusting the claims.

## VIII.   FRAUDULENT BILLING PRACTICES

585.    At all relevant times, the defendants submitted, or caused to be submitted, to Allstate records, reports, bills, and other medical documentation for treatment and services that were not compensable under Michigan's No-Fault Act because they were not medically

necessary, were rendered pursuant to a predetermined protocol that did not take into account the actual clinical needs of each individual patient, were excessive, and were performed to enrich the defendants rather than to treat or otherwise benefit patients, as evidenced by the rampant inter-referrals among the defendants.

586.    The defendants then submitted, and/or caused to be submitted, claims for payment under Michigan's No-Fault Act to Allstate based on this fraudulent medical documentation.

587.    All of the medical records, bills, and invoices submitted to Allstate by, or on behalf of, the defendants contained CPT Codes.

588.    CPT Codes are published annually by the AMA to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.

589.    In order for medical providers to receive the correct payment for their services, they must correctly identify the procedure performed and use the corresponding CPT Code.

590.    Certain procedures are billed using CPT Codes that reflect the level of complexity involved.

591.    It is the responsibility of the medical provider to select the CPT Code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

592.    The defendants made misrepresentations to Allstate by submitting documentation that included CPT Codes for medical services that (1) were not actually performed, (2) were not performed consistent with the AMA's CPT requirements, and/or (3) were wholly unwarranted.

593.     Moreover, the billing codes submitted to Allstate by, or on behalf of, the defendants consistently exaggerated the level of services purportedly provided in order to inflate the charges submitted to Allstate.

594.     The bills submitted to Allstate by the defendants were submitted on Health Insurance Claim Forms (HCFA) approved by the National Uniform Claim Committee (NUCC) and referenced in the NUCC Instruction Manual.

595.     The back of all HCFA forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

596.     Despite the warning on the back of the HCFA forms, the defendants included false, incomplete, and/or misleading information in the bills and supporting documentation submitted to Allstate for payment.

597.     The defendants engaged in a pattern of billing for procedures and treatment that was not actually rendered, was not medically necessary, was not supported by documentation, and which used incorrect procedure codes to inflate the charges submitted to Allstate.

598.     These fraudulent billing practices were utilized in violation of the Michigan No-Fault Act.

599.     As such, Allstate is not liable to pay the pending claims submitted by the defendants and is entitled to reimbursement of those monies already paid.

600.     Most prominently, the medical facility and physician defendants submitted bills to Allstate seeking reimbursement for high-level office visits that the defendants' own documentation and patient statements confirm did not occur as billed.

601.   When an individual has been in a motor vehicle accident and complains of neck and back pain, a licensed healthcare professional must obtain a history and perform an examination to arrive at a legitimate diagnosis.

602.   The licensed healthcare professional must also engage in medical decision-making to design a legitimate treatment plan that is tailored to the unique needs of each patient.

603.   The physician defendants routinely performed initial examinations and follow-up examinations to diagnose patients with sprains and strains of the cervical and lumbar regions of the back, as well as other conditions.

604.   The physician defendants relied on their purported initial and follow-up evaluations to prescribe physical therapy and refer for electrodiagnostic testing, both of which were usually unnecessary, if provided at all, as described above.

605.   Examination, evaluation, and the establishment of a diagnosis are all part of the process that helps healthcare providers determine an appropriate treatment plan specifically designed to aid each individual patient's care, recovery, and rehabilitation.

606.   The evaluation and management of a patient is usually billed through CPT Codes for office visits/examinations.

607.   A legitimate examination has three (3) components: (1) the patient history; (2) the systems review; and (3) tests and measures.

608.   The "patient history" is defined as a systematic gathering of past and current information related to why the patient is seeking medical services and includes data obtained (i.e., through an interview, a review of the patient's records, or from other sources) from among other things, family history, general health status, medical/surgical history, current conditions, and chief complaints.

609.    The "systems review" is an examination of the anatomical and physiological status of a patient's systems (e.g., cardiovascular/pulmonary, musculoskeletal, and neuromuscular systems).

610.    After an appropriate examination and questioning process, the healthcare provider determines the patient's needs, and generates diagnostic hypotheses that may be further investigated by utilizing specific tests and measures.

611.    "Tests and measures" are used to: (1) rule in (or rule out) causes of impairment and functional limitations; (2) establish a diagnosis, prognosis, and plan of care; and (3) select interventions.

612.    There are five levels at which an office visit/examination can be billed using CPT Codes: levels one through five, with level one being the least involved examination and level five being the most complex.

613.    Initial office visits/examinations are billed using a CPT Code that starts with the numbers "9920."

614.    The final number that completes the five-digit CPT Code is one of the numerals between one and five, depending on the extent of the examination.

615.    The criteria developed by the AMA to properly assign the CPT Code for an initial visit/examination include the components illustrated in the chart below:

|  | **HISTORY** | **EXAMINATION** | **MEDICAL DECISION-MAKING** | **FACE-TO-FACE TIME** |
|---|---|---|---|---|
| **99201** | Problem focused | Problem focused | Straight forward | 10 minutes |
| **99202** | Expanded problem focused | Expanded problem focused | Straight forward | 10 minutes |
| **99203** | Detailed | Detailed | Low complexity | 30 minutes |
| **99204** | Comprehensive | Comprehensive | Moderate complexity | 45 minutes |
| **99205** | Comprehensive | Comprehensive | High complexity | 60 minutes |

616.   Reevaluation or follow-up office visits/examinations are billed using a CPT Code that starts with the numbers "9921."

617.   The final number that completes the five-digit CPT Code is one of the numerals between one and five, depending on the extent of the re-examination.

618.   The criteria developed by the AMA to properly assign the CPT Code for a reevaluation or follow-up visit/examination include the components illustrated in the chart below:

|  | HISTORY | EXAMINATION | MEDICAL DECISION-MAKING | FACE-TO-FACE TIME |
|---|---|---|---|---|
| 99211 | Minimal presenting problem(s) | Minimal presenting problem(s) | Minimal presenting problem(s) | 5 minutes |
| 99212 | Problem focused | Problem focused | Straight forward | 10 minutes |
| 99213 | Expanded problem focused | Expanded problem focused | Low complexity | 15 minutes |
| 99214 | Detailed | Detailed | Moderate complexity | 25 minutes |
| 99215 | Comprehensive | Comprehensive | High complexity | 40 minutes |

619.   The factors considered to determine the "complexity" of medical decision-making in arriving at a proper CPT Code assignment for initial visits/examinations include:

|  | NUMBER OF DIAGNOSES OR MANAGEMENT OPTIONS | AMOUNT AND/OR COMPLEXITY OF DATA TO BE REVIEWED | RISK OF COMPLICATIONS AND/OR MORBIDITY OR MORTALITY |
|---|---|---|---|
| Straight forward decision-making (CPT Code 99201-99202) | Minimal | Minimal or none | Minimal |
| Low complexity decision-making (CPT Code 99203) | Limited | Limited | Low |
| Moderate complexity medical decision-making (CPT Code 99204) | Multiple | Moderate | Moderate |
| High complexity medical decision-making (CPT Code 99205) | Extensive | Extensive | High |

620.   The AMA has published examples of office visits that are appropriately billed using CPT Code 99205, including:

a.   "Initial outpatient evaluation of a 69-year-old male with severe chronic obstructive pulmonary disease, congestive heart failure, and hypertension."

b.   "Initial office evaluation of a 65-year-old female with exertional chest pain, intermittent claudication, syncope and a murmur of aortic stenosis."

*CPT Assistant, Spring 1992.*

621.   The AMA has published examples of office visits that are appropriately billed using CPT Code 99204, including:

a.   "Office visit for initial evaluation of a 63-year-old male with chest pain on exertion."

b.   "Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion."

c.   "Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization three times."

*CPT Assistant, Spring 1992.*

622.   The AMA has published examples of office visits that are appropriately billed using CPT Code 99215, including:

a.   "Office visit with 30-year-old male, established patient 3 month history of fatigue, weight loss, intermittent fever, and presenting with diffuse adenopathy and splenomegaly."

b.   "Office visit for evaluation of recent onset syncopal attacks in a 70-year-old woman, established patient."

*CPT Assistant, Spring 1992.*

623.   The AMA has published examples of office visits that are appropriately billed using CPT Code 99214, including:

70

a. "Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet.  She now complains of frequency to urination and weight loss, blood sugar of 320 and negative ketones on dipstick."

b. "Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication."

*CPT Assistant, Spring 1992.*

624.    The patients at issue in this Complaint almost never presented with symptoms or diagnoses similar in severity or complexity to any of the examples set out above.

625.    Instead, the defendants' patients were involved in low-level motor vehicle accidents and presented with soft-tissue injuries and complaints, to the extent patients had symptoms at all (many patients having presented because they were solicited to do so and not because they sought out medical treatment).

626.    Soft-tissue injuries usually resolve themselves without medical intervention.

627.    Yet, for every patient at issue in this Complaint, Beale, Lutwin, Weingarden, and Oniango almost always billed Allstate for level four and five examinations for the initial office visit (i.e., CPT Codes 99204 and 99205).

628.    For every patient at issue in this Complaint, Beale, Lutwin, Weingarden, and Oniango almost always billed Allstate for level four and five examinations for the follow-up visits (i.e., CPT Codes 99214 and 99215).

629.    Beale, for example, billed office visits at level four and above for almost every single patient he examined.

630.    Beale billed Allstate for level three or below office visits less than seven percent (7%) of the time.

631.    Lutwin overwhelmingly billed for office visits at levels four and five.

632.     The instances where Lutwin billed for office visits below level four represent less than seventeen percent (17%) of the total office visits for which he billed Allstate.

633.     Weingarden likewise billed at level four and above for more than eighty-five percent (85%) of the patients at issue in this Complaint that he treated.

634.     Oniango never billed less than level three and more than ninety percent (90%) of his office visits were billed at level four or five.

635.     To warrant a medical bill demanding payment for a level four examination, the injury/condition necessarily requires:

     a.   moderate risk of mortality, morbidity and/or complications;

     b.   moderate diagnoses and review of complex data; and

     c.   the defendants to: (1) obtain comprehensive patient histories; (2) conduct comprehensive examinations; and (3) evaluate the patient (face-to-face) in an interaction lasting approximately 45 minutes.

636.     To warrant a medical bill demanding payment for a level five examination, the injury/condition necessarily requires:

     a.   high risk of mortality, morbidity and/or complications;

     b.   extensive diagnoses and review of complex data; and

     c.   the defendants to: (1) obtain comprehensive patient histories; (2) conduct comprehensive examinations; and (3) evaluate the patient (face-to-face) in an interaction lasting approximately 60 minutes.

637.     The documentation submitted by the defendants to Allstate falls woefully short of meeting the threshold standard to bill for level four or five office visits.

638.     Indeed, with respect to each patient for whom Allstate was billed for a level four or five initial examination, the defendants failed to document the necessary history required by CPT Codes 99204 and 99205.

639.    With respect to each patient for whom Allstate was billed for a level four or five initial examination, the defendants failed to document the necessary examination required by CPT Codes 99204 and 99205.

640.    With respect to each patient for whom Allstate was billed for a level four or five initial examination, the defendants failed to document the necessary complexity of medical decision-making required by CPT Codes 99204 and 99205.

641.    The medical facility and physician defendants' own records demonstrate the billing for level four and five office visits constitutes a fraudulent misrepresentation of the services actually rendered by these defendants.

642.    Indeed, these records, and the lack of detail and specificity therein, evidence that the physician defendants rarely performed anything more than a perfunctory examination that often did not consist of anything more than asking patients a few questions.

643.    The records also demonstrate that the defendants' patients, almost all of whom were involved in minor motor vehicle accidents and were fully ambulatory, rarely presented with serious symptoms and injuries.

644.    Finally, the defendants' patients have confirmed that they rarely spent more than a few minutes with the physician defendants and that these visits rarely involved physical examinations or reexaminations.

645.    By creating medical bills that included CPT Codes for office visits and then causing such bills to be mailed to Allstate, the medical facility and physician defendants represented to Allstate that the invoiced medical services had been performed in conformity with the AMA's CPT Code Guidelines.

646.     However, all of the bills prepared and submitted by the defendants were submitted under fraudulent and deceptive examination CPT Codes.

647.     As such, Allstate is not obligated to pay any pending bills for office visits and is entitled to reimbursement for those office visits for which it has already tendered payment.

## IX.     SPECIFIC ALLEGATIONS OF MISREPRESENTATIONS MADE TO AND RELIED ON BY ALLSTATE

### A.     MISREPRESENTATIONS BY THE DEFENDANTS

648.     To induce Allstate to pay promptly the fraudulent charges for unnecessary and not provided medical services, the defendants submitted or caused to be submitted to Allstate false medical documentation that materially misrepresented that the medical services they provided were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully rendered (including rendered to patients who were not obtained in violation of Michigan's prohibition on the solicitation of patients).

649.     Claims for PIP medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

650.     Thus, every time the medical facility, physician, and PT clinic defendants (by and through their owners, managers, and individual healthcare providers), submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to necessary treatment for their patients' care, recovery, or rehabilitation.

651.     In fact, however, the treatment rendered by the defendants was rarely necessary, if it was rendered at all.

74

652.    First, as detailed *supra*, the defendants frequently violated established standards of care, reported false findings/results, treated excessively, and rendered treatment without adequate substantiation and justification.

653.    All of these factors negate the necessity of the treatment provided by the defendants.

654.    Second, treatment was not rendered by independent medical providers, but rather by facilities and individuals with financial incentive to refer to each other, which vitiates any claim of treatment necessity.

655.    Third, several patients did not present at the defendants of their own accord, but rather as a result of solicitation by agents of the defendants.

656.    If treatment is not required for a patient's care, recovery, or rehabilitation – and the solicitation tactics used by the defendants demonstrate that many patients were not requesting treatment at the time they were directed to the defendants – such treatment is not medically necessary.

657.    Finally, much of the treatment and the documentation supporting additional treatment emanated not from licensed healthcare professionals, but rather from attorneys with whom the defendants worked closely to ensure a steady flow of patients and clients.

658.    The foregoing facts – interrelationships between seemingly independent medical facilities, patient solicitation, and allowing lawyers to influence medical care – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

659.    Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment provided by the defendants unnecessary.

660.    The failure to reveal the true interrelated nature of the defendants is present with respect to every patient at issue in this Complaint.

661.    The fact of violations of medical standards is present with respect to almost every patient at issue in this Complaint, including those specific patient examples set out above and in the charts attached at Exhibits 1 to 10 and 12 to 14.

662.    Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act sent to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not medically necessary, as it must be in order to be compensable under Michigan law.

663.    Similarly, the Michigan No-Fault Act states that only a provider "lawfully rendering treatment" may submit a claim for payment.  Mich. Comp. Laws § 500.3157.

664.    The defendants rendered unnecessary treatment in derogation of Michigan law and solicited patients in violation of Michigan law.

665.    Thus, the treatment rendered by the defendants was not lawful and every claim for payment submitted to Allstate through the U.S. Mail misrepresented this fact.

666.    Moreover, each HCFA submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

667.    Through the submission of patient records, invoices, HCFAs, and other medical documentation to Allstate via the U.S. Mail, the defendants attested to the fact and medical necessity of the visits, examinations, interviews, screenings, testing, procedures, and ancillary services for which they billed Allstate.

76

668.    As the defendants improperly solicited patients, did not provide many of the services for which they billed Allstate, did not render reasonably necessary medical treatment, and engaged in fraudulent billing practices (discussed in sections V through VIII above, respectively), each bill and accompanying documentation submitted by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

669.    As licensed medical professionals, Beale, Lutwin, Weingarden, Oniango, Pillai, Rizvi, Varghese, and Joshi were obligated, legally and ethically, to act honestly, with integrity, and in accordance with their professional oaths and pledges.

670.    Each misrepresentation made by Beale, Lutwin, Weingarden, Oniango, Pillai, Rizvi, Varghese, and Joshi was in violation of their legal and ethical obligations as healthcare professionals.

B.    **ALLSTATE'S JUSTIFIABLE RELIANCE**

671.    The facially valid documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the accuracy of such documents.

672.    At all relevant times, the defendants concealed from Allstate facts regarding the fact and medical necessity of medical services allegedly provided by the defendants to prevent Allstate from discovering that the claims submitted by or on behalf of the defendants were not compensable under the No-Fault Act.

673.    These misrepresentations include submitting false medical documentation, including HCFAs, documenting the fact and necessity of medical treatment in order to seek reimbursement under Michigan's No-Fault Act.

674. Evidence of the fraudulent scheme detailed herein was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

675. Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme from Allstate, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

676. In reliance on the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

677. Allstate would not have paid these monies had the defendants provided true and accurate information about the necessity of the medical services provided.

678. Allstate would not have paid these monies had the defendants not misrepresented the facts surrounding how patients were referred to them (i.e., pursuant to a predetermined arrangement and via the use of solicitation tactics).

679. As a result, Allstate has paid in excess of $405,379 in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for reimbursement under the Michigan No-Fault Act.

## X.    SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

680. As discussed above, the defendants devised and agreed to enact a scheme to defraud Allstate by soliciting accident victims to seek treatment with them.

681. This solicitation was accomplished through the use of runners/solicitors who called and visited automobile accident victims to pressure them to treat with one or more of the defendants, through the use of symbiotic relationships with Michigan personal injury attorneys, and through the rampant inter-referrals between the defendants.

682.     The solicitation of patients was done for the purpose of ensuring that victims of motor vehicle accidents would be sent to the defendants, who billed Allstate for medical treatment that was not necessary and was often not actually provided.

683.     The treatment and services purportedly provided by the defendants were not necessary because (1) they were done pursuant to a predetermined protocol and not based on each patient's clinical needs, (2) they were not supported by proper medical assessment/diagnosis, and (3) they did not adhere to established medical guidelines and standards.

684.     The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibit 15 (2010 to present), was to collect No-Fault benefits to which the defendants were not entitled because the medical services rendered, if at all, were not necessary and were not lawfully rendered, and also because the defendants engaged in fraudulent billing practices.

685.     This objective necessarily required the submission of claims to Allstate.

686.     The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service.

687.     All documents, medical records, notes, reports, HCFAs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

688.     Every automobile insurance claim detailed herein involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks, and the return of the cancelled settlement drafts to

the financial institution(s) from which the draft(s) were drawn, as well as the return of settlement draft duplicates to the insurance carrier's home office for filing.

689.    The fraudulent medical billing scheme detailed herein generated hundreds of mailings.

690.    A chart highlighting representative examples of mail fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 15.

691.    As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate related to each exemplar patient discussed in this Complaint.

692.    Each of the individuals named as defendants herein, by and through the medical facility or PT clinic defendant in which he had an interest, mailed or caused to be mailed documents, including medical reports, records, and bills, that materially misrepresented that Beale, Lutwin, Weingarden, Oniango, Pillai, Rizvi, Varghese, Joshi, Brennan, and the other individual healthcare providers at each facility, were (1) providing reasonably necessary medical treatment, (2) that said treatment was lawfully rendered, and (3) that said treatment was properly billed.

693.    Indeed, it was within the ordinary course of business for each medical facility and PT clinic defendant to submit claims for No-Fault reimbursement to insurance carriers like Allstate through the U.S. Mail.

694.    As all of the defendants named herein agreed that the medical facility and PT clinic defendants would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

695.    Allstate reasonably relied on the submissions it received from the defendants (with many records authored by Beale, Lutwin, Weingarden, Oniango, Pillai, Rizvi, Varghese, Joshi, and Brennan) through the U.S. Mail in tendering payment to the defendants, including the representative submissions set out in Exhibit 15 annexed hereto.

696.    As the defendants agreed to pursue the same criminal objective (namely, mail fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XI.    DAMAGES

697.    The pattern of fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

698.    Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of $405,379.

699.    Exhibits 16 to 24, annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Allstate to the defendants by date, payor, payee, patient claim number, check number, and amount.

700.    Every claim identified in Exhibits 16 to 24 derives from an Allstate insurance policy.

701.    Allstate's claim for compensatory damages, as set out in Exhibits 16 to 24, does not include payment made with respect to any assigned claim facility claimant.

702.    Every payment identified in Exhibits 16 to 24 was made by Allstate alone and Allstate has not been reimbursed for any of the payments itemized in Exhibits 16 to 24.

703. Allstate also seeks damages, in an amount to be determined at trial, related to the cost of investigation to uncover the fraudulent activities of the defendants and the cost of claims handling/adjustment for claims submitted by the defendants.

704. Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XII. CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Medical Evaluations, P.C. Enterprise)
**Against Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, Jims T. Varghese, and Mark J. Brennan, M.D.**

705. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704 set forth above as if fully set forth herein.

706. In connection with each of the claims identified in the within Complaint, Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, Jims T. Varghese, and Mark J. Brennan, M.D. ("Count I defendants") intentionally caused to be prepared and mailed false medical documentation by Medical Evaluations, P.C., or knew that such false medical documentation would be mailed in the ordinary course of Medical Evaluations, P.C.'s business, or should have reasonably foreseen that the mailing of such false medical documentation by Medical Evaluations, P.C. would occur, in furtherance of the Count I defendants' scheme to defraud.

82

707.     The Count I defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 15.

708.     Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

709.     Policies of insurance were delivered to insureds through the U.S. Mail.

710.     Payments to Medical Evaluations, P.C. and its owner Beale from Allstate were transmitted through the U.S. Mail.

711.     As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by Medical Evaluations, P.C. to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

712.     As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Medical Evaluations, P.C. for the benefit of the Count I defendants that would not otherwise have been paid.

713.     The Count I defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count I defendants to continue their fraudulent scheme without detection.

714.     The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

83

715.    By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count I defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

716.    The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Medical Evaluations, P.C. for the benefit of the Count I defendants.

717.    Medical Evaluations, P.C. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

718.    The Count I defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

719.    Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I defendants' fraudulent acts.

720.    The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

721.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

722.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

723.    By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Medical Evaluations, P.C. Enterprise)
**Against Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, Jims T. Varghese, and Mark J. Brennan, M.D.**

724.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704 set forth above as if fully set forth herein.

725.    Defendants Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, Jims T. Varghese, and Mark J. Brennan, M.D. ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Medical Evaluations, P.C.

726.    The Count II defendants each agreed to further, facilitate, support, and/or operate the Medical Evaluations, P.C. enterprise.

727.    As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

728.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Medical Evaluations, P.C. even though Medical Evaluations, P.C. was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

729.    The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and legal documents containing material misrepresentations and/or material omissions.

730.     Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count II defendants' unlawful conduct described herein.

731.     By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>COUNT III</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Flint Wellness & Diagnostic Center, PLLC Enterprise)**
**Against Ann Arbor Physical Therapy Services, P.C., New Era Physical Therapy, P.C.,**
**Irwin M. Lutwin, D.O., Tahzibul H. Rizvi, Vinod B. Joshi, and Mark J. Brennan, M.D.**

732.     Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704 set forth above as if fully set forth herein.

733.     In connection with each of the claims identified in the within Complaint, Ann Arbor Physical Therapy Services, P.C., New Era Physical Therapy, P.C., Irwin M. Lutwin, D.O., Tahzibul H. Rizvi, Vinod B. Joshi, and Mark J. Brennan, M.D. ("Count III defendants") intentionally caused to be prepared and mailed false medical documentation by Flint Wellness & Diagnostic Center, PLLC, or knew that such false medical documentation would be mailed in the ordinary course of Flint Wellness & Diagnostic Center, PLLC's business, or should have reasonably foreseen that the mailing of such false medical documentation by Flint Wellness & Diagnostic Center, PLLC would occur, in furtherance of the Count III defendants' scheme to defraud.

734.    The Count III defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 15.

735.    Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

736.    Policies of insurance were delivered to insureds through the U.S. Mail.

737.    Payments to Flint Wellness & Diagnostic Center, PLLC and its owner Lutwin from Allstate were transmitted through the U.S. Mail.

738.    As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by Flint Wellness & Diagnostic Center, PLLC to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

739.    As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Flint Wellness & Diagnostic Center, PLLC for the benefit of the Count III defendants that would not otherwise have been paid.

740.    The Count III defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count III defendants to continue their fraudulent scheme without detection.

741.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

742.    By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count III defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

743.    The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Flint Wellness & Diagnostic Center, PLLC for the benefit of the Count III defendants.

744.    Flint Wellness & Diagnostic Center, PLLC constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

745.    The Count III defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

746.    Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III defendants' fraudulent acts.

747.    The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

748.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

749.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

750.    By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims

submitted, caused to be submitted, or known to be submitted, by them, and others acting in

concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Flint Wellness & Diagnostic Center Enterprise)
**Against Ann Arbor Physical Therapy Services, P.C., New Era Physical Therapy, P.C.,
Irwin M. Lutwin, D.O., Tahzibul H. Rizvi, Vinod B. Joshi, and Mark J. Brennan, M.D.**

751.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704

set forth above as if fully set forth herein.

752.    Defendants Ann Arbor Physical Therapy Services, P.C., New Era Physical

Therapy, P.C., Irwin M. Lutwin, D.O., Tahzibul H. Rizvi, Vinod B. Joshi, and Mark J. Brennan,

M.D. ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through

the facilitation of the operation of Flint Wellness & Diagnostic Center, PLLC.

753.    The Count IV defendants each agreed to further, facilitate, support, and/or operate

the Flint Wellness & Diagnostic Center, PLLC enterprise.

754.    As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

755.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on

behalf of Flint Wellness & Diagnostic Center, PLLC even though Flint Wellness & Diagnostic

Center, PLLC was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

756.    The Count IV defendants were aware of this purpose and agreed to take steps to

meet the conspiracy's objectives, including the creation and submission to Allstate of insurance

claim and legal documents containing material misrepresentations and/or material omissions.

757.    Allstate has been injured in its business and property by reason of this

conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a

result of the Count IV defendants' unlawful conduct described herein.

758.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT V**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Rehabilitation Medicine Group, P.C. Enterprise)**
**Against Suncare Rehab, Inc., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, Saul I. Weingarden, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, and Jims T. Varghese**

759.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704 set forth above as if fully set forth herein.

760.    In connection with each of the claims identified in the within Complaint, Suncare Rehab, Inc., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, Saul I. Weingarden, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, and Jims T. Varghese ("Count V defendants") intentionally caused to be prepared and mailed false medical documentation by Rehabilitation Medicine Group, P.C., or knew that such false medical documentation would be mailed in the ordinary course of Rehabilitation Medicine Group, P.C.'s business, or should have reasonably foreseen that the mailing of such false medical documentation by Rehabilitation Medicine Group, P.C. would occur, in furtherance of the Count V defendants' scheme to defraud.

761.    The Count V defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 15.

762.    Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

763.    Policies of insurance were delivered to insureds through the U.S. Mail.

764.    Payments to Rehabilitation Medicine Group, P.C. from Allstate were transmitted through the U.S. Mail.

765.    As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by Rehabilitation Medicine Group, P.C. to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

766.    As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Rehabilitation Medicine Group, P.C. for the benefit of the Count V defendants that would not otherwise have been paid.

767.    The Count V defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count V defendants to continue their fraudulent scheme without detection.

768.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

769.     By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count V defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

770.     The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Rehabilitation Medicine Group, P.C. for the benefit of the Count V defendants.

771.     Rehabilitation Medicine Group, P.C. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

772.     The Count V defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

773.     Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V defendants' fraudulent acts.

774.     The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

775.     Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

776.     Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

777.     By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Rehabilitation Medicine Group, P.C. Enterprise)
### Against Suncare Rehab, Inc., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, Saul I. Weingarden, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, and Jims T. Varghese

778.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704 set forth above as if fully set forth herein.

779.    Defendants Suncare Rehab, Inc., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, Saul I. Weingarden, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, and Jims T. Varghese ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Rehabilitation Medicine Group, P.C.

780.    The Count VI defendants each agreed to further, facilitate, support, and/or operate the Rehabilitation Medicine Group, P.C. enterprise.

781.    As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

782.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Rehabilitation Medicine Group, P.C., even though Rehabilitation Medicine Group, P.C. was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

783.    The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and legal documents containing material misrepresentations and/or material omissions.

784.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VI defendants' unlawful conduct described herein.

785.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VII**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Tete Oniango, M.D., PLLC Enterprise)**
**Against Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, and Jims T. Varghese**

786.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704 set forth above as if fully set forth herein.

787.    In connection with each of the claims identified in the within Complaint, Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, and Jims T. Varghese ("Count VII defendants") intentionally caused to be prepared and mailed false medical documentation by Tete Oniango, M.D., PLLC, or knew that such false medical documentation would be mailed in the ordinary course of Tete Oniango, M.D., PLLC's business, or should have reasonably foreseen that the mailing of such false medical documentation by Tete Oniango, M.D., PLLC would occur, in furtherance of the Count VII defendants' scheme to defraud.

788.     The Count VII defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 15.

789.     Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

790.     Policies of insurance were delivered to insureds through the U.S. Mail.

791.     Payments to Tete Oniango, M.D., PLLC from Allstate were transmitted through the U.S. Mail.

792.     As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by Tete Oniango, M.D., PLLC to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

793.     As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Tete Oniango, M.D., PLLC for the benefit of the Count VII defendants that would not otherwise have been paid.

794.     The Count VII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count VII defendants to continue their fraudulent scheme without detection.

795.     The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

796.    By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count VII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

797.    The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Tete Oniango, M.D., PLLC for the benefit of the Count VII defendants.

798.    Tete Oniango, M.D., PLLC constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

799.    The Count VII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

800.    Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII defendants' fraudulent acts.

801.    The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

802.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

803.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

804.    By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VIII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Tete Oniango, M.D., PLLC Enterprise)
**Against Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, and Jims T. Varghese**

805.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704 set forth above as if fully set forth herein.

806.    Defendants Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, and Jims T. Varghese ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Tete Oniango, M.D., PLLC.

807.    The Count VIII defendants each agreed to further, facilitate, support, and/or operate the Tete Oniango, M.D., PLLC enterprise.

808.    As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

809.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Tete Oniango, M.D., PLLC, even though Tete Oniango, M.D., PLLC was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

810.    The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and legal documents containing material misrepresentations and/or material omissions.

811.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VIII defendants' unlawful conduct described herein.

812.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Suncare Rehab, Inc. Enterprise)
**Against Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., and Sundaram S. Pillai**

813.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704 set forth above as if fully set forth herein.

814.    In connection with each of the claims identified in the within Complaint, Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., and Sundaram S. Pillai ("Count IX defendants") intentionally caused to be prepared and mailed false medical documentation by Suncare Rehab, Inc., or knew that such false medical documentation would be mailed in the ordinary course of Suncare Rehab, Inc.'s business, or should have reasonably foreseen that the mailing of such false medical documentation by Suncare Rehab, Inc. would occur, in furtherance of the Count IX defendants' scheme to defraud.

815.    The Count IX defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 15.

816.    Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

817.    Policies of insurance were delivered to insureds through the U.S. Mail.

818.    Payments to Suncare Rehab, Inc. from Allstate were transmitted through the U.S. Mail.

819.    As documented above, the Count IX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by Suncare Rehab, Inc. to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

820.    As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Suncare Rehab, Inc. for the benefit of the Count IX defendants that would not otherwise have been paid.

821.    The Count IX defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count IX defendants to continue their fraudulent scheme without detection.

822.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

823.    By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count IX defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

824.    The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Suncare Rehab, Inc. for the benefit of the Count IX defendants.

825.    Suncare Rehab, Inc. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

826.    The Count IX defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

827.    Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX defendants' fraudulent acts.

828.    The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

829.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

830.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

831.    By virtue of the Count IX defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT X**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Suncare Rehab, Inc. Enterprise)**
**Against Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango,**
**M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D.,**
**Tete E. Oniango, M.D., and Sundaram S. Pillai**

832.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704 set forth above as if fully set forth herein.

833.    Defendants Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., and Sundaram S. Pillai ("Count X defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Suncare Rehab, Inc.

834.    The Count X defendants each agreed to further, facilitate, support, and/or operate the Suncare Rehab, Inc. enterprise.

835.    As such, the Count X defendants conspired to violate 18 U.S.C. § 1962(c).

836.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Suncare Rehab, Inc. even though Suncare Rehab, Inc. was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

837.    The Count X defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and legal documents containing material misrepresentations and/or material omissions.

838.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count X defendants' unlawful conduct described herein.

839.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XI**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Ann Arbor Physical Therapy Services, P.C. Enterprise)**
**Against Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC, Tete Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Tete E. Oniango, M.D., and Tahzibul H. Rizvi**

840.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704 set forth above as if fully set forth herein.

841.    In connection with each of the claims identified in the within Complaint, Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC, Tete Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Tete E. Oniango, M.D., and Tahzibul H. Rizvi ("Count XI defendants") intentionally caused to be prepared and mailed false medical documentation by Ann Arbor Physical Therapy Services, P.C., or knew that such false medical documentation would be mailed in the ordinary course of Ann Arbor Physical Therapy Services, P.C.'s business, or should have reasonably foreseen that the mailing of such false medical documentation by Ann Arbor Physical Therapy Services, P.C. would occur, in furtherance of the Count XI defendants' scheme to defraud.

842.    The Count XI defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 15.

102

843.     Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

844.     Policies of insurance were delivered to insureds through the U.S. Mail.

845.     Payments to Ann Arbor Physical Therapy Services, P.C. from Allstate were transmitted through the U.S. Mail.

846.     As documented above, the Count XI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by Ann Arbor Physical Therapy Services, P.C. to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

847.     As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Ann Arbor Physical Therapy Services, P.C. for the benefit of the Count XI defendants that would not otherwise have been paid.

848.     The Count XI defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XI defendants to continue their fraudulent scheme without detection.

849.     The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

850.    By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XI defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

851.    The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Ann Arbor Physical Therapy Services, P.C. for the benefit of the Count XI defendants.

852.    Ann Arbor Physical Therapy Services, P.C. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

853.    The Count XI defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

854.    Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XI defendants' fraudulent acts.

855.    The Count XI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

856.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

857.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

858.    By virtue of the Count XI defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Ann Arbor Physical Therapy Services, P.C.  Enterprise)
### Against Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC, Tete Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Tete E. Oniango, M.D., and Tahzibul H. Rizvi

859.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704 set forth above as if fully set forth herein.

860.    Defendants Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC, Tete Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Tete E. Oniango, M.D., and Tahzibul H. Rizvi ("Count XII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Ann Arbor Physical Therapy Services, P.C.

861.    The Count XII defendants each agreed to further, facilitate, support, and/or operate the Ann Arbor Physical Therapy Services, P.C. enterprise.

862.    As such, the Count XII defendants conspired to violate 18 U.S.C. § 1962(c).

863.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Ann Arbor Physical Therapy Services, P.C. even though Ann Arbor Physical Therapy Services, P.C. was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

864.    The Count XII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and legal documents containing material misrepresentations and/or material omissions.

865.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XII defendants' unlawful conduct described herein.

866.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XIII**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Progressive Therapy & Rehab Center, Inc. Enterprise)**
**Against Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango,**
**M.D., PLLC, James E. Beale, Jr., M.D., Saul I. Weingarden, M.D., Tete E. Oniango, M.D.,**
**and Tahzibul H. Rizvi**

867.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704 set forth above as if fully set forth herein.

868.    In connection with each of the claims identified in the within Complaint, Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., and Tahzibul H. Rizvi ("Count XIII defendants") intentionally caused to be prepared and mailed false medical documentation by Progressive Therapy & Rehab Center, Inc., or knew that such false medical documentation would be mailed in the ordinary course of Progressive Therapy & Rehab Center, Inc.'s business, or should have reasonably foreseen that the mailing of such false medical documentation by Progressive Therapy & Rehab Center, Inc. would occur, in furtherance of the Count XIII defendants' scheme to defraud.

869.    The Count XIII defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 15.

106

870.     Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

871.     Policies of insurance were delivered to insureds through the U.S. Mail.

872.     Payments to Progressive Therapy & Rehab Center, Inc. from Allstate were transmitted through the U.S. Mail.

873.     As documented above, the Count XIII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by Progressive Therapy & Rehab Center, Inc. to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

874.     As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Progressive Therapy & Rehab Center, Inc. for the benefit of the Count XIII defendants that would not otherwise have been paid.

875.     The Count XIII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XIII defendants to continue their fraudulent scheme without detection.

876.     The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

877.     By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XIII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

878.     The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Progressive Therapy & Rehab Center, Inc. for the benefit of the Count XIII defendants.

879.     Progressive Therapy & Rehab Center, Inc. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

880.     The Count XIII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

881.     Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIII defendants' fraudulent acts.

882.     The Count XIII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

883.     Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

884.     Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

885.     By virtue of the Count XIII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Progressive Therapy & Rehab Center, Inc. Enterprise)
### Against Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., and Tahzibul H. Rizvi

886.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704 set forth above as if fully set forth herein.

887.    Defendants Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., and Tahzibul H. Rizvi ("Count XIV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Progressive Therapy & Rehab Center, Inc.

888.    The Count XIV defendants each agreed to further, facilitate, support, and/or operate the Progressive Therapy & Rehab Center, Inc. enterprise.

889.    As such, the Count XIV defendants conspired to violate 18 U.S.C. § 1962(c).

890.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Progressive Therapy & Rehab Center, Inc. even though Progressive Therapy & Rehab Center, Inc. was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

891.    The Count XIV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and legal documents containing material misrepresentations and/or material omissions.

892.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XIV defendants' unlawful conduct described herein.

893.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count XIV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XIV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XV
### VIOLATION OF 18 U.S.C. § 1962(c)
**(Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc. Enterprise) Against Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., and Tahzibul H. Rizvi**

894.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704 set forth above as if fully set forth herein.

895.    In connection with each of the claims identified in the within Complaint, Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., and Tahzibul H. Rizvi ("Count XV defendants") intentionally caused to be prepared and mailed false medical documentation by Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., or knew that such false medical documentation would be mailed in the ordinary course of Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc.'s business, or should have reasonably foreseen that the mailing of such false medical documentation by Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc. would occur, in furtherance of the Count XV defendants' scheme to defraud.

896.    The Count XV defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 15.

110

897.     Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

898.     Policies of insurance were delivered to insureds through the U.S. Mail.

899.     Payments to Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc. from Allstate were transmitted through the U.S. Mail.

900.     As documented above, the Count XV defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc. to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

901.     As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc. for the benefit of the Count XV defendants that would not otherwise have been paid.

902.     The Count XV defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XV defendants to continue their fraudulent scheme without detection.

903.     The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

904. By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XV defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

905. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc. for the benefit of the Count XV defendants.

906. Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

907. The Count XV defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

908. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XV defendants' fraudulent acts.

909. The Count XV defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

910. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

911. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

912. By virtue of the Count XV defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

112

## COUNT XVI
### VIOLATION OF 18 U.S.C. § 1962(d)
**(Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc. Enterprise) Against Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., and Tahzibul H. Rizvi**

913.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704 set forth above as if fully set forth herein.

914.    Defendants Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., and Tahzibul H. Rizvi ("Count XVI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc.

915.    The Count XVI defendants each agreed to further, facilitate, support, and/or operate the Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc. enterprise.

916.    As such, the Count XVI defendants conspired to violate 18 U.S.C. § 1962(c).

917.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc. even though Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc. was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

918.    The Count XVI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and legal documents containing material misrepresentations and/or material omissions.

919.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XVI defendants' unlawful conduct described herein.

920.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XVI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XVII**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Northwestern Rehabilitation Services, LLC Enterprise)**
**Against Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango,**
**M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D.,**
**Tete E. Oniango, M.D., and Jims T. Varghese**

921.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704 set forth above as if fully set forth herein.

922.    In connection with each of the claims identified in the within Complaint, Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., and Jims T. Varghese ("Count XVII defendants") intentionally caused to be prepared and mailed false medical documentation by Northwestern Rehabilitation Services, LLC, or knew that such false medical documentation would be mailed in the ordinary course of Northwestern Rehabilitation Services, LLC's business, or should have reasonably foreseen that the mailing of such false medical documentation by Northwestern Rehabilitation Services, LLC would occur, in furtherance of the Count XVII defendants' scheme to defraud.

114

923.     The Count XVII defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 15.

924.     Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

925.     Policies of insurance were delivered to insureds through the U.S. Mail.

926.     Payments to Northwestern Rehabilitation Services, LLC from Allstate were transmitted through the U.S. Mail.

927.     As documented above, the Count XVII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by Northwestern Rehabilitation Services, LLC to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

928.     As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Northwestern Rehabilitation Services, LLC for the benefit of the Count XVII defendants that would not otherwise have been paid.

929.     The Count XVII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XVII defendants to continue their fraudulent scheme without detection.

930.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

931.    By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XVII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

932.    The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Northwestern Rehabilitation Services, LLC for the benefit of the Count XVII defendants.

933.    Northwestern Rehabilitation Services, LLC constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

934.    The Count XVII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

935.    Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XVII defendants' fraudulent acts.

936.    The Count XVII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

937.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

938.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

939.    By virtue of the Count XVII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the

claims submitted, caused to be submitted, or known to be submitted, by them, and others acting

in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XVIII**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Northwestern Rehabilitation Services, LLC Enterprise)**
**Against Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango,**
**M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D.,**
**Tete E. Oniango, M.D., and Jims T. Varghese**

940.     Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704

set forth above as if fully set forth herein.

941.     Defendants Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete

Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden,

M.D., Tete E. Oniango, M.D., and Jims T. Varghese ("Count XVIII defendants") conspired with

each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of

Northwestern Rehabilitation Services, LLC.

942.     The Count XVIII defendants each agreed to further, facilitate, support, and/or

operate the Northwestern Rehabilitation Services, LLC enterprise.

943.     As such, the Count XVIII defendants conspired to violate 18 U.S.C. § 1962(c).

944.     The purpose of the conspiracy was to obtain No-Fault payments from Allstate on

behalf of Northwestern Rehabilitation Services, LLC even though Northwestern Rehabilitation

Services, LLC was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

945.     The Count XVIII defendants were aware of this purpose and agreed to take steps

to meet the conspiracy's objectives, including the creation and submission to Allstate of

insurance claim and legal documents containing material misrepresentations and/or material

omissions.

946.     Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XVIII defendants' unlawful conduct described herein.

947.     By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XVIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XIX**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(New Era Physical Therapy, P.C. Enterprise)**
**Against Flint Wellness & Diagnostic Center, PLLC, Irwin M. Lutwin, D.O., and Vinod B. Joshi**

948.     Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704 set forth above as if fully set forth herein.

949.     In connection with each of the claims identified in the within Complaint, Flint Wellness & Diagnostic Center, PLLC, Irwin M. Lutwin, D.O., and Vinod B. Joshi ("Count XIX defendants") intentionally caused to be prepared and mailed false medical documentation by New Era Physical Therapy, P.C., or knew that such false medical documentation would be mailed in the ordinary course of New Era Physical Therapy, P.C.'s business, or should have reasonably foreseen that the mailing of such false medical documentation by New Era Physical Therapy, P.C. would occur, in furtherance of the Count XIX defendants' scheme to defraud.

950.     The Count XIX defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 15.

118

951.     Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

952.     Policies of insurance were delivered to insureds through the U.S. Mail.

953.     As documented above, the Count XIX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by New Era Physical Therapy, P.C. to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

954.     As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, incurred expenses for adjusting and processing the claims submitted by New Era Physical Therapy, P.C. for the benefit of the Count XIX defendants that would not otherwise have been paid.

955.     The Count XIX defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XIX defendants to continue their fraudulent scheme without detection.

956.     The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

957.     By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XIX defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

958.    The activities alleged in this Complaint had the direct effect of causing Allstate to expend costs related to the claims submitted by, and on behalf of, New Era Physical Therapy, P.C. for the benefit of the Count XIX defendants.

959.    New Era Physical Therapy, P.C. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

960.    The Count XIX defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

961.    Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIX defendants' fraudulent acts.

962.    The Count XIX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

963.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

964.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

965.    By virtue of the Count XIX defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XX
### VIOLATION OF 18 U.S.C. § 1962(d)
### (New Era Physical Therapy, P.C. Enterprise)
### Against Flint Wellness & Diagnostic Center, PLLC, Irwin M. Lutwin, D.O., and Vinod B. Joshi

966.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704 set forth above as if fully set forth herein.

967.    Defendants Flint Wellness & Diagnostic Center, PLLC, Irwin M. Lutwin, D.O., and Vinod B. Joshi ("Count XX defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of New Era Physical Therapy, P.C.

968.    The Count XX defendants each agreed to further, facilitate, support, and/or operate the New Era Physical Therapy, P.C. enterprise.

969.    As such, the Count XX defendants conspired to violate 18 U.S.C. § 1962(c).

970.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of New Era Physical Therapy, P.C. even though New Era Physical Therapy, P.C. was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

971.    The Count XX defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and legal documents containing material misrepresentations and/or material omissions.

972.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XX defendants' unlawful conduct described herein.

973.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count XX defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XX

defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XXI
## COMMON LAW FRAUD
**Against Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC, Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, New Era Physical Therapy, P.C., James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, Jims T. Varghese, Vinod B. Joshi, and Mark J. Brennan, M.D.**

974.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704 set forth above as if fully set forth herein.

975.   The scheme to defraud Allstate perpetrated by Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC, Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, New Era Physical Therapy, P.C., James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, Jims T. Varghese, Vinod B. Joshi, and Mark J. Brennan, M.D. ("Count XXI defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were lawfully and actually rendering necessary medical treatment in compliance with the Michigan No-Fault Act and were entitled to collect benefits thereunder.

976.   The misrepresentations of fact made by the Count XXI defendants include, but are not limited to, those material misrepresentations discussed in section IX *supra.*

977.    The Count XXI defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

978.    The misrepresentations were intentionally made by the Count XXI defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment under the Michigan No-Fault Act would be submitted to Allstate.

979.    The Count XXI defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

980.    Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for medical expenses pursuant to No-Fault insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the medical facility defendants.

981.    As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged as previously described herein.

## COUNT XXII
## CIVIL CONSPIRACY
**Against Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC, Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, New Era Physical Therapy, P.C., James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, Jims T. Varghese, Vinod B. Joshi, and Mark J. Brennan, M.D.**

982.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704 set forth above as if fully set forth herein.

983.    Defendants Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC, Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, New Era Physical Therapy, P.C., James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, Jims T. Varghese, Vinod B. Joshi, and Mark J. Brennan, M.D. ("Count XXII defendants") combined and concerted to accomplish the unlawful purpose of defrauding Allstate by submitting claims for reimbursement under the No-Fault Act to which they were not entitled because (1) the defendants billed Allstate for treatment that was not actually provided; (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants wrongly solicited patients, thus rendering the treatment unlawful, and (4) the defendants utilized fraudulent billing practices.

984.    The Count XXII defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

985.    This purpose was known to all of the Count XXII defendants and intentionally pursued.

986.    Despite knowing that they were not entitled to reimbursement under the No-Fault Act because they billed for services that were not actually rendered and that were not reasonably necessary, because treatment was not lawfully rendered, and because they utilized fraudulent billing practices, the Count XXII defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment to the defendants.

987.     In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

988.     All of the Count XXII defendants benefited from the payments wrongfully procured from Allstate.

989.     Therefore, the Count XXII defendants committed acts that caused damage to Allstate.

990.     All of the Count XXII defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XXII defendants in the commission of acts done for the benefit of all Count XXII defendants and to the unjustified detriment of Allstate.

991.     Accordingly, all of the Count XXII defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

## COUNT XXIII
### PAYMENT UNDER MISTAKE OF FACT
**Against Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC, Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, New Era Physical Therapy, P.C., James E. Beale, Jr., M.D., and Irwin M. Lutwin, D.O.**

992.     Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704 set forth above as if fully set forth herein.

993.     Allstate paid the amounts described herein under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the necessity of medical services purportedly provided by Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC, Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, Suncare Rehab, Inc., Ann Arbor Physical Therapy Services,

P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a

Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, New Era

Physical Therapy, P.C., James E. Beale, Jr., M.D., and Irwin M. Lutwin, D.O. ("Count XXIII

defendants").

994.    Allstate sustained damages by paying under a mistake of fact the claims submitted

by, or on behalf of, the Count XXIII defendants, which misrepresented the reasonableness, fact,

lawfulness, and necessity of the medical treatment allegedly rendered and/or whether the

patient's injury arose out of a motor vehicle accident.

995.    The Count XXIII defendants, individually and jointly and severally, would be

unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of

fact.

996.    Allstate is entitled to restitution from each of the Count XXIII defendants,

individually and jointly and severally, for all monies paid to and/or received by them from

Allstate.

### COUNT XXIV
### UNJUST ENRICHMENT
**Against Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC,
Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, Suncare Rehab, Inc.,
Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc.,
Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc.,
Northwestern Rehabilitation Services, LLC, New Era Physical Therapy, P.C., James E.
Beale, Jr., M.D., and Irwin M. Lutwin, D.O.**

997.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704

set forth above as if fully set forth herein.

998.    Allstate paid monies in response to the claims submitted, or caused to be

submitted, by defendants Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC,

Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, Suncare Rehab, Inc., Ann

Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum

Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation

Services, LLC, New Era Physical Therapy, P.C., James E. Beale, Jr., M.D., and Irwin M.

Lutwin, D.O. ("Count XXIV defendants") in reasonable belief that it was legally obligated to

make such payments based upon fraudulent misrepresentations.

999.   Allstate's payments constitute a benefit which the Count XXIV defendants

aggressively sought and voluntarily accepted.

1000.   The Count XXIV defendants wrongfully obtained payments from Allstate through

the fraudulent scheme detailed herein.

1001.   The Count XXIV defendants have been unjustly enriched by receipt of these

wrongfully-obtained payments from Allstate.

1002.   The Count XXIV defendants' retention of these payments would violate

fundamental principles of justice, equity, and good conscience.

### COUNT XXV
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
**Against Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC,
Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, Suncare Rehab, Inc.,
Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc.,
Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc.,
Northwestern Rehabilitation Services, LLC, New Era Physical Therapy, P.C., James E.
Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D.,
Sundaram S. Pillai, Tahzibul H. Rizvi, Jims T. Varghese, Vinod B. Joshi, and Mark J.
Brennan, M.D.**

1003.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 704

set forth above as if fully set forth herein.

1004.   Defendants Medical Evaluations, P.C., Flint Wellness & Diagnostic Center,

PLLC, Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, Suncare Rehab, Inc.,

Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc.,

Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, New Era Physical Therapy, P.C., James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, Jims T. Varghese, Vinod B. Joshi, and Mark J. Brennan, M.D. ("Count XXV defendants") routinely performed medically unnecessary and unlawful treatment with respect to those patients at issue in this Complaint.

1005. The Count XXV defendants also rendered medical treatment pursuant to a fraudulent scheme whereby patients were referred to them for the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment.

1006. Pursuant to the Michigan No-Fault Act, Mich. Comp. Law § 500.3101, *et seq.*, an insurer is liable to pay benefits only for reasonable and necessary expenses arising out of a motor vehicle accident.

1007. The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident. Mich. Comp. Law § 500.3107.

1008. Where a claimant and/or assignee is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

1009. The Count XXV defendants continue to submit claims under the No-Fault Act for unnecessary and/or unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

1010. The Count XXV defendants will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that their activities are unlawful and that Allstate has

no obligation to pay pending, previously-denied, and/or any future No-Fault claims submitted by any of the Count XXV defendants.

1011.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXV defendants provided medically unnecessary treatment that is not compensable under Michigan's No-Fault Act.

1012.   Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXV defendants billed Allstate for services that they did not render.

1013.   Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXV defendants did not lawfully render treatment.

1014.   Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXV defendants were engaged in a fraudulent scheme whereby they provided medically unnecessary treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

1015.   As such, the Count XXV defendants have no standing to submit, pursue, or receive assigned No-Fault benefits from Allstate.

## XIII.   DEMAND FOR RELIEF

WHEREFORE, plaintiffs Allstate Insurance Company and Allstate Property & Casualty Insurance Company respectfully pray that judgment enter in their favor, as follows:

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Medical Evaluations, P.C. Enterprise)**
**Against Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, Jims T. Varghese, and Mark J. Brennan, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at

       trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest,

       costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the

       wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Medical Evaluations, P.C. Enterprise)**
**Against Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, Jims T. Varghese, and Mark J. Brennan, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at

       trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest,

       costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the

       wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Flint Wellness & Diagnostic Center, PLLC Enterprise)**
**Against Ann Arbor Physical Therapy Services, P.C., New Era Physical Therapy, P.C.,**
**Irwin M. Lutwin, D.O., Tahzibul H. Rizvi, Vinod B. Joshi, and Mark J. Brennan, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IV
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Flint Wellness & Diagnostic Center, PLLC Enterprise)**
**Against Ann Arbor Physical Therapy Services, P.C., New Era Physical Therapy, P.C.,**
**Irwin M. Lutwin, D.O., Tahzibul H. Rizvi, Vinod B. Joshi, and Mark J. Brennan, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT V**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Rehabilitation Medicine Group, P.C. Enterprise)**
**Against Suncare Rehab, Inc., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, Saul I. Weingarden, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, and Jims T. Varghese**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT VI**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Rehabilitation Medicine Group, P.C. Enterprise)**
**Against Suncare Rehab, Inc., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, Saul I. Weingarden, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, and Jims T. Varghese**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Tete Oniango, M.D., PLLC Enterprise)
**Against Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, and Jims T. Varghese**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VIII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Tete Oniango, M.D., PLLC Enterprise)
**Against Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, and Jims T. Varghese**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Suncare Rehab, Inc. Enterprise)
**Against Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., and Sundaram S. Pillai**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Suncare Rehab, Inc. Enterprise)
**Against Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., and Sundaram S. Pillai**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
**(Ann Arbor Physical Therapy Services, P.C. Enterprise)**
**Against Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC, Tete Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Tete E. Oniango, M.D., and Tahzibul H. Rizvi**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
**(Ann Arbor Physical Therapy Services, P.C. Enterprise)**
**Against Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC, Tete Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Tete E. Oniango, M.D., and Tahzibul H. Rizvi**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIII
### VIOLATION OF 18 U.S.C. § 1962(c)
**(Progressive Therapy & Rehab Center, Inc. Enterprise)**
**Against Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango,**
**M.D., PLLC, James E. Beale, Jr., M.D., Saul I. Weingarden, M.D., Tete E. Oniango, M.D.,**
**and Tahzibul H. Rizvi**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at

trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest,

costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIV
### VIOLATION OF 18 U.S.C. § 1962(d)
**(Progressive Therapy & Rehab Center, Inc. Enterprise)**
**Against Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango,**
**M.D., PLLC, James E. Beale, Jr., M.D., Saul I. Weingarden, M.D., Tete E. Oniango, M.D.,**
**and Tahzibul H. Rizvi**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at

trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest,

costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT XV**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc. Enterprise)**
**Against Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango,**
**M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D.,**
**Tete E. Oniango, M.D., and Tahzibul H. Rizvi**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at

trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest,

costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT XVI**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc. Enterprise)**
**Against Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango,**
**M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D.,**
**Tete E. Oniango, M.D., and Tahzibul H. Rizvi**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at

trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest,

costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XVII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Northwestern Rehabilitation Services, LLC Enterprise)
**Against Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., and Jims T. Varghese**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XVIII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Northwestern Rehabilitation Services, LLC Enterprise)
**Against Medical Evaluations, P.C., Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., and Jims T. Varghese**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (New Era Physical Therapy, P.C. Enterprise)
### Against Flint Wellness & Diagnostic Center, PLLC, Irwin M. Lutwin, D.O., and Vinod B. Joshi

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XX
### VIOLATION OF 18 U.S.C. § 1962(d)
### (New Era Physical Therapy, P.C. Enterprise)
### Against Flint Wellness & Diagnostic Center, PLLC, Irwin M. Lutwin, D.O., and Vinod B. Joshi

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XXI
## COMMON LAW FRAUD
**Against Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC, Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, New Era Physical Therapy, P.C., James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, Jims T. Varghese, Vinod B. Joshi, and Mark J. Brennan, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at

trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in

the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XXII
## CIVIL CONSPIRACY
**Against Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC, Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, New Era Physical Therapy, P.C., James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, Jims T. Varghese, Vinod B. Joshi, and Mark J. Brennan, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at

trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in

the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XXIII
### PAYMENT UNDER MISTAKE OF FACT
**Against Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC, Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, New Era Physical Therapy, P.C., James E. Beale, Jr., M.D., and Irwin M. Lutwin, D.O.**

(a)     AWARD Allstate its actual damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XXIV
### UNJUST ENRICHMENT
**Against Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC, Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, New Era Physical Therapy, P.C., James E. Beale, Jr., M.D., and Irwin M. Lutwin, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XXV
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
**Against Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC, Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, New Era Physical Therapy, P.C., James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, Jims T. Varghese, Vinod B. Joshi, and Mark J. Brennan, M.D.**

(a)     DECLARE that Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC,

        Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, Suncare Rehab, Inc.,

        Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc.,

        Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc.,

141

Northwestern Rehabilitation Services, LLC, New Era Physical Therapy, P.C., James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, Jims T. Varghese, Vinod B. Joshi, and Mark J. Brennan, M.D. wrongfully submitted bills for medical treatment that was not reasonably necessary and, therefore, not compensable under the Michigan No-Fault Act;

(b)     DECLARE that the activities of Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC, Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, New Era Physical Therapy, P.C., James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, Jims T. Varghese, Vinod B. Joshi, and Mark J. Brennan, M.D. were fraudulent; and

(c)     DECLARE that Allstate has no obligation to pay pending, previously-denied, and/or future No-Fault insurance claims submitted by Medical Evaluations, P.C., Flint Wellness & Diagnostic Center, PLLC, Rehabilitation Medicine Group, P.C., Tete Oniango, M.D., PLLC, Suncare Rehab, Inc., Ann Arbor Physical Therapy Services, P.C., Progressive Therapy & Rehab Center, Inc., Spectrum Development Corporation d/b/a Restorative Therapy Services, Inc., Northwestern Rehabilitation Services, LLC, New Era Physical Therapy, P.C., James E. Beale, Jr., M.D., Irwin M. Lutwin, D.O., Saul I. Weingarden, M.D., Tete E. Oniango, M.D., Sundaram S. Pillai, Tahzibul H. Rizvi, Jims T. Varghese, Vinod B. Joshi, and Mark J. Brennan, M.D.; and

(d)     GRANT all other relief this Court deems just and appropriate.

142

## XIV.   <u>JURY TRIAL DEMAND</u>

The plaintiffs hereby demand a trial by jury on all claims.

Respectfully submitted,

SMITH & BRINK, P.C.

*/s/ Richard D. King, Jr.*
_____
Richard D. King, Jr.
rking@smithbrink.com
Nathan A. Tilden (P76969)
ntilden@smithbrink.com
Jacquelyn A. McEttrick
jmcettrick@smithbrink.com
350 Granite St., Suite 2303
Braintree, MA 02184
(617) 770-2214

*Attorneys for Plaintiffs*
*Allstate Insurance Company and*
*Allstate Property & Casualty*
*Insurance Company*

Dated:  November 12, 2013